IN THE MATTER OF THE CAMDEN COUNTY 1987
JUDICIAL BUDGET IMPASSE.

Submitted July 31, 1987—Decided August 3, 1987.
Opinion October 22, 1987.

*Suzette D. Bonfiglio,* Camden County Counsel, submitted briefs on behalf of petitioner Camden County Board of Chosen Freeholders.

*George W. Fisher,* Deputy Attorney General, submitted briefs on behalf of respondent Camden County Assignment

Judge (*W. Cary Edwards*, Attorney General of New Jersey, attorney).

PER CURIAM.

These proceedings brought under *Rule* 1:33–9 result from an impasse between the Camden County Board of Freeholders and the Camden County Assignment Judge concerning the 1987 operating budget for the Camden County courts.

The case requires us, once again, to evaluate a request for additional resources to operate an efficient judicial system in light of the resources available to county governments to fund those operations. Currently, New Jersey's judicial system is funded largely through two main sources: appropriations from the State's general revenues and appropriations from each county's tax upon real property within that county. Additionally, certain designated court operations receive federal funds. Intensive study of the present system's fiscal implications continues. The July 1987 Report of the State of New Jersey's County and Municipal Government Study Commission on Judicial Unification notes that the state trial court system is primarily funded by county government. "Counties provide 91% of the personnel and 82% of the expenditures. The 1986 *net* county cost for funding the State Trial Court System is $174.3 million." *Id.* at XIV. We recognize this burden.

Prior to our 1981 adoption of *Rule* 1:33–9, budget disputes between county government and the county's judiciary were subject to resolution by order of the assignment judge for the county's vicinage. We designed the *Rule* 1:33–9 procedures, which provide for review of the impasse by a panel consisting of a judge or judges not from the vicinage and other persons, to assure each of the parties that its position will receive a disinterested review and a balanced presentation to this Court. Neither party in the present case is fully pleased by the panel's report, but each party was able to present its case fully to the panel.

We have established the procedure under *Rule* 1:33–9 better to resolve disputes between the judiciary and county government. once an impasse has developed over county-based funding. However, this case demonstrates that more should be done in the initial budgeting stages to seek to resolve the matters in dispute. For, in addition to the monetary constraints discussed, the budgeting cycle of county government poses special problems. State government operates on a July 1–June 30 fiscal year. Thus, ordinarily, an agency of state government will have its budget set for an upcoming year when the appropriations bill is signed. That agency will be able to plan its year at that point. County government, however, does not fund its annual fiscal program until the fiscal year is partially over. County government budgets on a calendar year basis, but by law county budgets are not adopted until February 25th. *N.J.S.A.* 40A:4–10. In practice, budget adoption frequently occurs even later because county government tries to forecast the outcome of state budgeting that is taking place concurrently. In this case the county budget was not adopted until late April.

The judicial manager at the county level thus does not learn until April what his or her operating budget is for the fiscal year that began in January; he or she then must try to fill vacant job titles via Civil Service or otherwise within the allotted months remaining in the budget year. When, as here, an impasse delays resolution of the judiciary's budget, the process makes for about four months of real budget planning. These problems are further complicated by the fact that the responsible officials each must proceed without the benefit of a full understanding of the other's situation. County witnesses were candid here to admit that they had not developed the expertise to evaluate the sums necessary to operate an efficient court system, although they were obliged by the procedural posture of this case to offer such views. The officers of the judiciary were equally candid concerning the county's financial constraints. Superimposed upon all of this are the provisions

of *N.J.S.A.* 40A:4–45.4, the so-called "Cap Law" that generally limits any county's appropriations in a given year to an amount not in excess of five percent of the previous year's tax levy in that county. One can imagine how industry would thrive on such a budgetary cycle. The need for improved planning and harmony of effort at the county level is clear, for the county, the judiciary, and the public will ultimately suffer if we do not now efficiently plan governmental services.

I

A brief recital of the overall economic issues will place the matter in perspective. The adopted 1987 Camden County budget for all operations was $176,076,509. The amount appropriated by the County for the judicial branch was $8,248,353, or roughly 4.7% of the total County budget. The dispute arises from the difference between that figure and the assignment judge's original request of $9,026,645.

On May 5, 1987, pursuant to *Rule* 1:33–9(a), the Assignment Judge entered a recommended disposition and order that, if it had not been appealed by the filing of a notice of petition for review by the Supreme Court, would have added $833,838 to the judiciary budget. The difference between the judiciary's original and later requests reflects in part some misunderstanding about what was contained in non-judiciary portions of the county's budget affecting judicial employees. *Infra* at 29. The County, however, filed its notice of petition for review, and the Assignment Judge filed a response as mandated by *Rule* 1:33–9(c). Pursuant to its discretionary power under *Rule* 1:33–9(d), the Court granted the petition and referred the matter to a designated three-member panel. That panel consisted of Charles S. Joelson and William G. Bischoff, retired judges, and Walter Wechsler, former Budget Director of the State of New Jersey.

Hearings were conducted by the panel on July 7, 8, and 9, 1987. Principal witnesses were the Camden County Comptrol-

ler on behalf of the County, and the Trial Court Administrator on behalf of the Assignment Judge. Each party was represented by counsel, and the panel engaged in considerable questioning and discussion with all involved.

The panel submitted its report on July 23, 1987, recommending an increase of $361,109. Thereafter, both the County and Assignment Judge filed exceptions to that report. On August 3, 1987, this Court accepted the panel report with one exception and by order reduced the Assignment Judge's requested increase over the County's appropriation to $315,046. This opinion follows that order and explains our conclusions in this matter. For the convenience of the parties, we shall refer to the hearing record by reference to the transcripts of the hearings and to certain exhibits.

## II

The panel report thoroughly discusses the objections and budgetary concerns expressed by the County. At the outset, it recognizes the significant pressure on the County to adjust its budget to account for $26,450,000 in revenue losses and mandatory budget increases for 1987 alone, in the context of a total 1987 budget appropriation of $176,076,509. As the panel noted, the limitation by the "cap" law, N.J.S.A. 40A:4-45.4, of annual tax increases generally to five percent over the previous year's county tax levy complicated the matter. A final wrinkle was the occurrence of an additional pay period in 1987. Hence, the Board of Freeholders was forced to impose deep cuts in the requested budgets of many County departments and programs: $750,000 from the County College request (causing a concomitant increase in tuition); $500,000 from the County Board of Social Services' request; and $4,700,000 from various County departmental requests, including $1,961,324 from the Psychiatric and Long Term Care program for County hospitals.

These were significant cuts, imposed to solve a difficult problem faced by the County. Yet despite the cuts, and as

stated by the panel, "the County [would nevertheless] face a deficit and be over the 'cap' law limitations if it must comply with the Assignment Judge's order of May 15, 1987[.]" We are not unmindful of this effect: we are concerned about the County's acute problem and recognize its efforts to reach a solution.

The County's overall approach to its fiscal problem was to make cuts where it thought them possible. Its approach to the judicial budget as initially described by its fiscal officer was summarized as follows:

$230,000—could be cut because the judiciary realized that amount of surplus in 1986.

$650,000—could be cut by eliminating 30 to 33 judicial positions.

[Transcript of proceedings, July 8, 1987, 21D, 23D (hereinafter cited by date and page).]

At that time, no particular evaluation of the effect of the cuts was made. The County's fiscal officer recognized that what one of the panel's members characterized as a "shopping list" of cuts was primarily an effort to achieve a budgetary goal based on what she described as "recommendations" premised on her experience with other departments [July 8 30D]. These general financial policies were the premises for certain recommendations such as the pooling of judicial secretaries or law clerks.

The New Jersey judiciary is, by constitutional design, a separate branch of government. It is in no sense, then, just another branch of county government. Its independence and vitality depend upon the time-tested principles of separation of powers, principles that have served our state and nation well by reposing in the other branches of government the fiscal responsibility to support the judiciary. Thus, while general county budget practices are of undoubted assistance in analyzing judicial budgets, a qualitative analysis of their effects must be made.

We make these observations about the county budget process not by way of criticism but merely to explain the difficulties

that each party faces. Little profit is gained by the judiciary's questioning whether the County should have foreseen the 1987 budget crunch and thus maintained higher appropriations in 1986 in order to allow more leeway for the 1987 cap increase. We are concerned chiefly with two things: the needs of the judiciary and the ability of the county to meet those needs.

In this case the mutually contemplated shortfall was narrowed by the time of the impasse hearing by clearer understanding of certain issues and the passage of time. The Attorney General explains it thus:

> The Assignment Judge's May 15, 1987 recommended disposition/order sought an additional $833,830 for the 1987 Judicial budget. However, at the panel hearing, the parties agreed that two items totalling approximately $336,000 previously believed to be in dispute were in actuality *not* in dispute and so removed them from consideration by the Panel. One such item was $245,000 in Judicial positions which were funded entirely by State or Federal grants paid to the County. The second was $91,000 to pay for a six percent raise to non-union Judicial employees, the funding for which—unknown to the Judiciary but as represented by County officials at the hearing—had been appropriated by the County in its 1987 budget, albeit in a non-Judicial portion of the budget. The removal of these items from the budget impasse, in conjunction with the mere passage of time between the date of the Assignment Judge's order and the date of the hearing, resulted in an adjustment at the hearing in the amount sought by the Judiciary from $833,830 to $403,033. It must be emphasized that although that amount was so adjusted, the needs of the Judiciary addressed by the Assignment Judge in his May order and at the July panel hearing have remained the same at all times.

On this assumption, the Assignment Judge calculated the Judiciary's needs as follows:

> Additional funding required to meet existing payroll, $231,864.
>
> Additional funding required to fill vacancies, $122,677 (as will be noted later, both the assignment judge and the county now agree that $46,063 of that amount can be eliminated).
>
> Additional funding required for salary adjustments, $12,318.
>
> Salary adjustment for two assistant chief probation officers, $1,100.
>
> Implementing promotion program for probation officers upon passing of civil service examination, $9,231.
>
> Two additional probation officers, $10,768.
>
> "Other expense" item, $59,460.

When the County believed that the deficit in the judiciary budget involved some $891,000, it had suggested reductions to achieve that end.[1]

The hearing continued to focus upon those proposed reductions as areas of disagreement. Major points of controversy before the hearing panel were:

1. The County continued to believe that twenty probation officer positions could be eliminated from the budget. This was premised upon a misunderstanding of data that showed that thirty-three officers [July 8 29D] had no active case loads; that information led the County to believe that there were too many chiefs and not enough soldiers. In fact, the senior chief, assistant chief, and chief probation officers, while described as having no case loads, are either directly supervising probation officers with very heavy active case loads; training new probation officers themselves; performing important responsibilities of the probation service such as pretrial interventions and juvenile intake, in difficult cases; or supervising specialized sections within the department [EXH. J–12].

The panel concluded that although cutting twenty probation officers from the current staff of some 100 "would save the County considerable money, it would also serve to destroy the

---

[1]Those original proposals to the panel for reducing the 1987 budget for operation of the County courts included the following:

Demoting 25 to 31 current Senior Probation Officers, laying off
25 Probation Officers ...........................................$450,000
Withholding automatic promotions for forty Probation Officers ..  32,000
Pooling and reducing number of secretaries to Judges ...........  248,000
Reducing Trial Court Administrator staff, eliminating Assistant
Trial Court Administrator, one secretary and one Administrative
Intern .........................................................  84,724
Eliminating two Case Manager positions ........................  76,700
TOTAL .........................................................$891,424

[Report at 5.]

performance and efficiency of the Probation Department, which is a vitally important arm of the courts." Camden's probation case load is among the toughest in the State. That case load has gone up approximately forty-two percent over the last seven years [July 9 127], while personnel have increased by five and a half percent since 1981 [July 9 128]. The panel agreed with the Assignment Judge that the proposed reduction would lead to an immediate increase of 33% in the caseloads of individual probation officers, this in the face of continuing increases in workload, collections and investigations by the Probation Department. The panel further recognized the additional duties to be imposed by the Legislature's recent passage of the Comprehensive Drug Reform Act, *L.* 1987, *c.* 106.

2. The panel rejected the County's next proposal, which would have withheld the automatic promotions of forty probation officers. The panel reasoned that because it was improbable that all eligible probation officers would pass the requisite civil service examinations and because of the fact that although the increase in pay would be $800 per year for any successful candidate, three-quarters of a year would have passed before any promotions could be implemented, the financial consequences were so minimal as not to warrant entry into the sensitive area of labor relations. In addition, the panel noted that this was a contractual obligation which it had no authority to declare unenforceable.

The hotly-debated point of the legality of "automatically" promoting "Senior" probation officers who pass the Civil Service eligibility test is somewhat of a diversion. The premise of the argument is that it was wrong for the judiciary to abdicate by negotiation its non-delegable powers of appointment and promotion. In fact, the arrangement appears to be nothing more than a salary adjustment and opportunity for minority advancement that represented a genuine effort to upgrade the quality of probation service. Unless there is to be some upward movement either in salary or in recognition, Camden will continue to lose the workers it trains to other comparable

agencies of government. We sense no abdication of governmental responsibility in this contractual agreement. In any event, it is not an issue to be resolved in the impasse process.

3. The next county proposal called for pooling and reducing the number of judges' secretaries. On the basis of practicality, the panel declined to adopt this suggestion. Given that the judges are on the bench during the middle portion of the day, "a pooling arrangement would not work because all trial judges would need a secretary at roughly the same time." Moreover, the panel found that the trial judges' large caseloads, with their corresponding volumes of paperwork, did not warrant such a decrease in support.[2]

4. The next proposal was to reduce the trial court administrator's staff by eliminating the assistant trial court administrator, one secretary and one administrative intern. The panel adopted the Assignment Judge's data on the function of each staff member to support their conclusion that "the impact of the loss of any one of the three" would be too significant given the responsibilities of these positions.

5. The final proposal called for elimination of two case manager positions. The panel observed that *Rule* 1:33–7 provides for a case manager for each court support unit, i.e., for Civil, Criminal and Family Divisions of the Superior Court. At the time of the hearing the panel found that Camden had a Criminal and Family Case Manager and a vacancy in the Civil Case Manager's office. The County argued that two of the positions could be eliminated, suggesting that other judiciary or County Clerk personnel could perform the work. The panel reasoned that if qualified personnel were found on such staff,

---

[2]The panel noted that, although not delineating it as a specific proposal, the County also suggested the pooling of "law secretaries," better known as "law clerks." The panel deemed the proposal unworkable, given the concentrated workload on motion days and the need for immediate research by law clerks at trial. In sum, the pervasive need for one-on-one interaction between judge and clerk rendered the pooling proposal impractical in the view of the panel.

they could indeed be assigned to such positions, but believed that the positions were necessary. Naturally, any corresponding reduction in the need for other judiciary or County Clerk personnel to perform similar services should be reflected in reduction of these budgets.

The panel then addressed the affirmative budget requests made by the Assignment Judge: 1) the filling of vacancies;[3] 2) certain limited salary adjustments; and 3) two additional probation officers. Focusing first on the filling of vacancies, the panel report reviewed each request for Probation Department or Superior Court positions. Regarding the former, the panel noted the same concerns about the effect of personnel shortages on the operation of the probation system that led it to deny the County's request to eliminate probation positions. Concerning the latter, it reasoned that general concerns about workload and efficiency precluded leaving the positions vacant. Without purporting to break down the costs assumed by the federal government for Title IV D employees, it remains clear that an efficient judiciary will serve the County well. Some $7,000,000 is collected annually in support obligations to defray county welfare costs. [July 8 30.] Therefore, noting that on an annualized basis the cost of filling the vacancies was $359,-270, the panel recommended that the vacancies not be filled until September 1, 1987, in order to confine the increase to $122,677 (after adjustment for a position that already had been filled).

The Assignment Judge's second request was for salary increases totalling $11,500 annually that would bring certain employees' salaries to parity with similar personnel. The pri-

---

[3]It is somewhat of a misnomer to refer to these as vacancies. In fact, they are previously funded positions that could not be filled during the calendar year because of the uncertainty in the budget process. The adopted county budget simply did not provide sufficient funds to maintain previously budgeted positions. Hence, the shortfall is managed first by delaying the filling of vacancies and as a last resort by laying off personnel.

mary object was to equate certain *Rule* 1:33 personnel such as intake officers with officers in the probation service. While fairness warranted the salary adjustments, the panel concluded that the fiscal condition of the County counselled retroactive adjustment to July 1, 1987 (with the exception of one employee for whom the panel recommended a salary adjustment retroactive to January 1, 1987).

Finally, the panel rejected the judiciary's request for two additional probation officers. It reasoned that allowance for filling vacancies was sufficient when balanced against the taxpayers' desire to limit spending increases by "cap" laws.

The parties had stipulated that if no County proposals were adopted and if Assignment Judge increases were denied, the deficit in meeting the existing payroll would be $231,864. Hence, after adding the $122,677 approved for filling vacancies and the $6,568 for salary adjustments, the panel recommended that an additional $361,109 be provided for operating the County courts.

### III

Both parties raised exceptions to the panel's recommendations. The County raised as a general exception the fact that the panel report failed fully to reference the modified recommendations of the parties; the County alleged that the report thereby drew conclusions that were not reflective of the judiciary's current needs. In addition, the County raised as a general exception the fact that the panel did not apply to the budget requests the standard of review required by *In re Hudson County 1982 Judicial Budget Impasse*, 91 *N.J.* 412 (1982), and *In re Union County Judicial Budget Impasse*, 87 *N.J.* 1 (1981). That standard requires that any funding request made in the context of a judicial budget impasse be proven "reasonably necessary for the efficient operation of the court system." *Hudson County, supra*, 91 *N.J.* at 415 (citing *R.* 1:33–5; 1:33–5(e)). The County also objected to the panel's

consideration of its 1986 budget-planning, a factor that we have previously referred to as not within the judiciary's province.

The County continued, however, to argue before us that the probation department and the Trial Court Administrator had sufficient staff and had performed well during the judiciary's last rating period. It also objected to the panel's findings on pooling secretaries and law clerks, on the *Rule* 1:33 salary adjustments [4] and on the so-called "automatic promotion issue." The Assignment Judge continued both to assert the need for two additional probation officers and certain salary adjustments and to note the absence of "other expense" funds for non-salary items.

Although we might have resolved certain of the issues differently (for example, we believe that the salary adjustments for *Rule* 1:33 employees are important to the relationship between the several classes of judicial employees, that increases for Assistant Chief Probation Officers would bring Camden in line with other vicinages, and that the "other expenses" items sought were well justified), with but one exception, to be noted, we are satisfied that the overall resolution by the panel will provide sufficient funds for the operation of the Camden judiciary. Specifically, we agree that deep cuts in the Camden probation service would seriously disable that court service. As for pooling secretaries and law clerks, we agree that the subject is not unthinkable but rather requires much more analysis to be workable.

We are continually studying the relationship of court support personnel to judges to achieve the most productive means of delivering judicial services to the public. Current data show that a properly established staff can greatly increase the ability of judges to achieve their principal goals: the resolution of

---

[4]The panel had awarded $6,568; this represented a compromise of a salary adjustment by making it retroactive only to July 1. The assignment judge wants the full-year retroactivity, which would add $5,750 to that item.

disputes between individuals and the administration of criminal justice. We shall continue to study per-case costs in comparable vicinages to assure the most cost-effective judicial practices. Likewise shall we endeavor to use the personnel of the County Clerk so that courts may assist the staff of the Trial Court Administrator in the most efficient way.

Our modification of the panel report will reflect the agreement between the judiciary and the County that the additional sums necessary to budget for existing and needed vacancies can be reduced by $46,063. Hence, our order entered on August 3, 1987, provided that the additional amount needed to fund the judiciary's needs for the balance of 1987 is $315,046. We also premised this judgment upon the belief that the County's budget did indeed cover the comparable 6% increase for non-union judicial employees and that this increase would not be withdrawn.[5]

We are mindful of the pressing needs of our counties and of the overall efforts to revise the funding of judicial operations in the State. We believe, however, that the increases proposed by our order can be accommodated within the "Cap Law." We note in passing that the total salary and wage cuts proposed under the county budget amounted to some $600,000, with $230,000 of the deficit coming from the judiciary. In other words, more than forty percent of the total cuts were to be absorbed by a branch of government whose budget comprised approximately five percent of the county's. [July 8 4D.]

We repeat our hope that closer cooperation between county and judiciary officials will enable us to improve on the budgeting process in future years. What appears here to be a lessening or narrowing of the difference is in reality only the

---

[5]The County has since petitioned us to review the Assignment Judge's order implementing such increases. Should this opinion not resolve that issue, the parties should submit any further papers within ten days of the date hereof. As supplemented the record will enable us to resolve the matter without need for further hearings or argument.

effect of delaying, through the impasse process, the full funding of the judiciary. What happens in such an impasse is that a county's judiciary will be underfunded for eight months of the year. If we are correct in our assessment of the judiciary's needs, it means that civil and criminal dockets of the county involved will show the effect, in quality, quantity, or both, of such underfunding. The public in turn will bear the consequences. We must all work to serve the public interest as economically but as efficiently as we can.

Accordingly, the Report and Recommendations of the three-member panel is hereby modified.

*For modification*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal*—None.