IN THE MATTER OF THE 1987 ESSEX COUNTY
JUDICIAL BUDGET IMPASSE.

Submitted September 11, 1987—Decided November 25, 1987.

*Harry J. DelPlato* and *Thomas M. Bachman,* Assistants
County Counsel, submitted briefs on behalf of petitioners Essex
County Executive and Essex County Board of Chosen Freehold-
ers (*H. Curtis Meanor,* Acting Essex County Counsel, and
*Thomas M. McCormack,* Freeholders Counsel, attorneys).

*George W. Fisher,* Deputy Attorney General, submitted
briefs on behalf of respondent John A. Marzulli, Assignment
Judge of Superior Court, Essex County (*W. Cary Edwards,*
Attorney General of New Jersey, attorney; *James J. Ciancia,*
Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

GARIBALDI, Justice.

This matter concerns the resolution of the impasse between the Board of Freeholders of Essex County and the Assignment Judge of Essex County regarding the Essex County judicial budget for the 1987 operating year pursuant to *Rule* 1:33-9.

In October of 1986 the Assignment Judge submitted to the County a 1987 judicial budget of $24,212,257. The County advised the Assignment Judge that it would not be able to appropriate that sum. Accordingly, the judiciary reviewed the budget, and on April 22, 1987, submitted a revised budget of $20,947,044. The County determined it would likewise not be able to appropriate that sum. On May 14, 1987, the County adopted its final 1987 budget in which $18,521,431 was appropriated for the judiciary.[1]

On June 17, 1987, pursuant to *Rule* 1:33-9(a), the Assignment Judge entered a Recommended Disposition/Order directing the County to increase the judicial budget to $21,643,824, or approximately $3.1 million above the County's appropriation. The County [2] filed its notice of petition for review and the Assignment Judge filed a response as mandated by *Rule* 1:33-9(c).

Pursuant to *Rule* 1:33-9(d), the Court granted the County's petition to review the Recommended Disposition/Order of the Assignment Judge and referred the matter to a three-member panel. The panel consisted of the Hon. Thomas F. Shebell, Jr., J.A.D., the Hon. Charles S. Joelson, J.A.D. (Retired), and Walter Wechsler, formerly Budget Director of the State of New Jersey. The panel conducted hearings on August 5, 6, and 7, 1987, and rendered its report on August 18, 1987. Both the

---

[1] Included in the County's 1987 budget is the sum of $6,445,503 (approximately 35% of the judiciary budget) as anticipated revenues from the courts, *e.g.*, from fines, filing fees, forfeitures, etc.

[2] Throughout these proceedings the Board of Freeholders of Essex County and the Essex County Executive have taken the same position and have filed joint petitions and briefs.

Assignment Judge and the County filed exceptions to that report. This opinion follows an Order entered by the Court on September 15, 1987.

## I

The New Jersey Constitution of 1947 provides that "[t]he Supreme Court shall make rules governing the administration of all Courts in the State ...", *N.J. Const.* of 1947 art. VI, § 2, para. 3, and that "[t]he Chief Justice of the Supreme Court shall be the administrative head of all the courts in the State." *N.J. Const.* of 1947 art. VI, § 7, para. 1.

The earlier New Jersey Constitutions of 1776 and 1844 did not give the Court the authority to provide for the administration of the courts. Indeed, many claim that

> [t]he intent of the 1947 Constitutional Convention was to vest the Supreme Court with the broadest possible administrative authority. Conceptually, such authority encompasses all facets of the internal management of our courts. This was made clear by the Committee on the Judiciary which considered it a fundamental requirement that the courts be vested with "exclusive authority over administration." [*Lichter v. County of Monmouth*, 114 *N.J.Super.* 343, 349 (App.Div.1971) (citations omitted).]

See 2 *Proceedings of the Constitutional Convention of 1947*, at 1180; *Passaic County Probation Officers' Ass'n v. County of Passaic*, 73 *N.J.* 247, 251 (1977).

The Court's responsibility for the administration of all the courts has been consistently interpreted to imply the "power reasonably necessary to fulfill that responsibility." *In re Court Budget and Court Personnel Essex County*, 81 *N.J.* 494, 496 (1980); *Passaic County Probation Officers' Ass'n v. County of Passaic, supra*, 73 *N.J.* at 252; *In re Mattera*, 34 *N.J.* 259, 272 (1961); *In re Court Reorganization Plan of Hudson County*, 161 *N.J.Super.* 483, 490 (App.Div.1978), aff'd o.b., 78 *N.J.* 498 (1979). Inherent in the Court's authority over the administration of the courts is its "concomitant responsibility to see that the public interest is fully served by the proper functioning of this vital branch of our government." *Passaic*

*County Probation Officers' Ass'n v. County of Passaic, supra,* 73 *N.J.* at 253.

Pursuant to *Rule* 1:33–4, we delegated to each Assignment Judge of the state, as the authorized representative of the Chief Justice, plenary responsibility for the administration of all the courts in his vicinage. Those responsibilities include all matters affecting county and municipal government, including but not limited to budgets, personnel, and facilities; the supervision and efficient management of all court matters; the supervision, superintendence, and allocation of all judges and judicial support personnel; and the appointment and discharge of judicial support personnel. Assignment Judges have the inherent power not only to provide the facilities, personnel, and resources reasonably necessary for the operation of the courts but also "to compel the appropriation and expenditure of funds by the coequal executive and legislative branches of government to accomplish such purpose, subject only to bounds of reasonable discretion." *In re Court Reorganization Plan of Hudson County, supra,* 161 *N.J.Super.* at 491 (citations omitted).

In short, an Assignment Judge, within his vicinage, has the power and authority over all facets of the internal management of the courts. Likewise, the Assignment Judge has "the concomitant responsibility to see that the public interest is fully served" by the judicial system in the vicinage. *Passaic County Probation Officers' Ass'n v. County of Passaic, supra,* 73 *N.J.* at 253.

As a matter of comity and respect for the other branches of government, we exercise our power to administer the courts sparingly and with deference to the other branches of government. The public is best served when all branches of government cooperate in attempting to accommodate their respective interests. To do otherwise is "pointless and self-defeating." *Passaic County Probation Officers' Ass'n v. County of Passaic, supra,* 73 *N.J.* at 255; *Matter of the Camden County 1987*

*Judicial Budget Impasse,* 109 *N.J.* 24 (1987); *Matter of Judges of Passaic County,* 100 *N.J.* 352 (1985); *In re Court Reorganization Plan of Hudson County, supra,* 161 *N.J.Super.* at 491.

It is beyond dispute that our counties have serious and legitimate concerns regarding the budgets for the state trial court system. "Counties provide 91% of the personnel and 82% of the expenditures" of the state trial court system. Report of the State of New Jersey County and Municipal Government Study Commission on Judicial Unification, July, 1987, at XIV; *Matter of the Camden County 1987 Judicial Budget Impasse, supra,* 109 *N.J.* at 25; *Matter of Judges of Passaic County, supra,* 100 *N.J.* at 362; *In re Hudson County 1982 Judicial Budget Impasse,* 91 *N.J.* 412, 420 (1982); *In re Union County 1981 Judicial Budget Impasse,* 87 *N.J.* 1, 3 (1981).

Faced with rising costs and less funds available from other governmental sources, counties are understandably reluctant to increase the burden on their taxpayers. Changes in the counties' funding of the state trial court system are under much discussion. Nevertheless, under current law counties still bear the major responsibility for the funding of the state trial court system.

Throughout the years "county governments have manifested a genuine commitment to the proper funding of an effective court system." *Matter of Judges of Passaic County, supra,* 100 *N.J.* at 362. This commitment, we believe, is a recognition by the counties that, although an integral part of the statewide court system, trial courts serve the legal needs of the residents of the county. An efficient and effective legal system is essential for the safety and well-being of the counties' citizens. The County, therefore, has an extremely strong interest in ensuring that the people of Essex County are well-served by the judicial branch.

Although we are mindful of the fiscal problems facing the counties, we must keep in mind that the ultimate goal is to ensure that the judicial functions within the county be per-

formed on such a level "that the administration of justice is not impaired." *In re Union County 1981 Judicial Budget Impasse, supra,* 87 *N.J.* at 3. Regardless of the county's fiscal condition, this goal cannot be ignored. Maintaining the "delicate balance" between the county's need for fiscal responsibility and the court's need for the proper administration of justice "is no easy task." *Id.*

Recognizing the counties' plight and in an attempt to accommodate their legitimate concerns, we promulgated *Rule* 1:33-9. The Rule sets forth the procedures to be followed in resolving a budgetary dispute between the judiciary and the county government. *Rule* 1:33-9 provides for the designation of a three-member panel consisting of Appellate Division judges, retired judges and justices from outside the vicinage and such other persons as the Chief Justice deems qualified to review the impasse. The panel holds hearings, in which each party is represented by counsel and has an opportunity to present its position. The panel thus assures each party "that its position will receive a disinterested review and a balanced presentation to this Court." *Matter of Camden County 1987 Judicial Budget Impasse, supra,* 109 *N.J.* at 25. The panel's test in reviewing the Assignment Judge's request is "whether the appropriation is reasonably necessary." *R.* 1:33- 9(e). The procedures set forth in *Rule* 1:33-9 have been followed in this case.

## II

The panel heard extensive testimony during its deliberations. Trial Court Administrator William W. Carpenter testified on behalf of the judiciary as did Edwin Kennedy, Chief of Statistics for the Administrative Office of the Courts. Donald Biase, Special Assistant to the Essex County Executive, testified on behalf of the County. The County also called as an expert witness Carl Baar, a Professor of Political Science at Brock University, Ontario, Canada. Professor Baar is also Director of

the Judicial Administration Program at the University and a lecturer at the Institute for Court Management of the National Judicial College, Reno, Nevada.

The County's major argument throughout these proceedings is that it faces a fiscal crisis in 1987 and simply cannot afford to appropriate the requested funds for the judicial budget. Although there is no "cap" law [3] limitation problem in Essex County for 1987, the County Executive made a decision that there would be no increase in county taxes in 1987. This decision is based on the County Executive's belief that he received a mandate from the people who elected him to prevent any increase in county taxes. EXH. J–22. Unfortunately, while revenues from county taxes remained stationary in 1987, revenues from other sources, such as federal revenue-sharing, substantially decreased. Thus, in preparing its 1987 budget, the county was faced with budget requests that substantially exceeded available revenues. In February of 1987 the County Executive announced that the county was experiencing horrendous problems "balancing its 1987 budget" and urged a hiring freeze in all county departments. EXH. C–21. In furtherance of this position the County determined that nonmandated raises for county employees would be frozen for 1987. Accordingly, the County asserts that it is treating the judiciary similarly to the county executive departments, and that it would be demoralizing and counterproductive to allow raises for the judicial employees.

Due to this fiscal crisis, the County provided the judiciary with a budget 12% below its 1986 appropriation. Furthermore, the County suggests that there be no salary increases throughout the judiciary for unclassified employees, that there be reductions in the county clerk's judicial staff, that the number of secretaries and law clerks for judges be reduced by one-half,

---

[3] *N.J.S.A.* 40A:4–45.4, the so-called "cap law," provides that a county may not increase the county tax levy in excess of 5% of the previous year's county tax.

that funding for the law library staff be eliminated, and that certain new and/or vacant positions in the courts and jury department be eliminated.

The Assignment Judge argues that the budget forces the judiciary to bear an inordinate share of County cutbacks. Although total appropriations for the County in 1987 declined by just under 3%, the amount appropriated for the judiciary declined by 12%. Put another way, the judicial budget is approximately 6% of the overall county budget but sustained 25% of the cuts in the county budget. Aside from a very small budget category for "unclassified" expenses and expenditures of amounts received from state and federal grants, the judiciary experienced the greatest decline in appropriations of all major categories in the county budget. In fact, with the exception of the unclassified category, the state and federal grants category and the surrogate, whose budget was decreased by $10,712, the overall budgets of all other departments and agencies in the county were increased.

However, the County responds that for the period from 1981 through 1986 the judicial budget increased at an average annual rate of 8.9%, or a total five-year increase of 44%, whereas the county executive departments for the same period averaged only a 3.4% annual increase, which totaled 17% over the same five-year period.

Moreover, the County asserts that the judiciary did not even expend all its 1986 judicial budget. This allegation is contradicted by the Assignment Judge. He claims that the vacancies that existed at the end of 1986 and resulted in a 1986 budget surplus were not the result of voluntary actions by the judiciary but were the result of the County's failure to adopt a budget earlier. Therefore, positions that had been budgeted for a full year in the judiciary's 1986 requested budget could be filled only at mid-year or later. Because of the County's fiscal crisis the judiciary voluntarily withheld action on filling vacancies until the end of the year and then was unable to fill them

because of the County's failure or refusal to process the necessary personnel action forms.

Both parties presented detailed evidence concerning the caseload and costs per judge and other court personnel as well as data on the productivity of the various departments of the judiciary. The evidence presented included comparisons among the twenty-one counties in the state. The panel, however, refused to make specific findings on the number of staff or costs per judge assigned to the County or the relative productivity of the judges. According to the panel, there were "too many variables and too little known about the significance of such statistics for any meaningful conclusions to be drawn from the data presented." Panel Report at 4. Neither side in a *Rule* 1:33-9 appropriation hearing has the burden of proof, the sole test being whether disputed appropriations are "reasonably necessary." *R.* 1:33-9(e).

In reaching its conclusion on whether the requested appropriations are "reasonably necessary," the panel was mindful of the need to strike a balance between the County's fiscal needs and the court's needs for proper administration of justice. It stated:

> This panel is keenly sensitive to the present state of the County's finances and has rendered its recommendations as to what is reasonably necessary for the operation of the courts against that background, but also with an understanding of how the County got into its present budget crisis. The obligation to properly fund Judiciary needs remains upon the County. The panel cannot recommend budget cuts which would result in a diminution of the quality of justice to be accorded the citizens of Essex County and the State of New Jersey when the necessary funding can be found within the resources reasonably available. If the Freeholders do not desire to cut expenditures by other departments within the County in order to fund such recommendations of the panel as may be adopted by the Supreme Court, then emergency appropriations with a carry-over to the 1988 budget may be feasible. [Panel Report at 4.]

Succinctly stated, the panel decided to preserve the status quo by establishing a wage freeze, by funding existing positions, and by denying funding for new promotions and positions. The panel acknowledged that its recommendations would still leave numerous positions ordered by the Assignment

Judge unfilled. The panel was not persuaded, in some instances, that additional support staff would increase productivity, and concluded that the additional costs of more staff were not justified at this time.

Specifically, the panel recommended: (1) that merit increases or raises for all judicial employees including law clerks, which were not mandated by law or contract, be denied; (2) that 1987 wages be frozen for any group of employees whose employment contracts would be negotiated in 1987; (3) that no new positions in the Law Division be created (although the panel did approve the filling of four vacancies in the Law Division); (4) that the positions of Librarian and clerk typist in the law library be eliminated and that the library be maintained by law clerks on a rotating basis; and (5) that only eight of the fourteen additional positions requested for the Superior Court–Family Part be created.

The panel did, however, recommend (1) that six additional positions in the Special Civil Part be created; (2) that in the Jury Department two new employees, rather than the three that the Assignment Judge requested, be hired; (3) that nine court clerk vacancies and nine new positions be added in the County Clerk–Judiciary Department; and (4) that four filled positions in the Essex County Local Intensive Probation Supervision Effort (IPS), which offers a cost-effective alternative to imprisonment for certain felons, be continued for the remainder of the year.

The panel also rejected the County's request that the number of secretaries be reduced by one-half and the number of law clerks be reduced from forty-four to twenty-four. The panel found that the proposed reduction in the number of secretaries would seriously impair the efficiency of the court system. The panel also rejected the proposed reduction in the number of law clerks. The panel cautioned that "to maintain a proper level of judicial performance and to insure that the judges are in a position to make correct and informed decisions, the present

level of law clerks should not be reduced. The resultant loss in the quality of justice which would be caused by the cutback requires that the proposal be rejected." Panel Report at 7.

A substantial part of the Assignment Judge's budget request in dispute relates to the Probation Department. The Assignment Judge made three specific requests concerning the Probation Department.

1. *Probation Officers' Contract.* On March 20, 1987, the Assignment Judge executed a two-year collective bargaining agreement between the judiciary and the Essex County Probation Officers Association. The County claims that the contract was illegal, or in the alternative, may be avoided under the doctrine of impossibility due to the County's lack of funds. The panel declined to resolve these contractual issues. Thus, the panel assumed, for the purpose of making its recommendation, that the issues would be litigated or the contract re-negotiated. The panel recommended that in the interim all provisions of the Probation Officers' contract *except* those regarding raises be followed. One consequence of this recommendation was to enforce the contract provision calling for 4% compensation for the extra half hour of daily work required by the contract since this was not regarded as a "raise."

2. *IPS Employees.* The Essex County Local Intensive Probation Supervision Effort, "IPS," is cost effective in that the estimated cost of housing a prisoner in Essex County is $21,900 a year, whereas the IPS Program costs approximately $2,500 per enrollee. There are presently four filled positions in IPS. The panel accepted the Assignment Judge's request that the same staffing level be maintained for the remainder of the year.

3. *Additional Probation Positions.* The Assignment Judge's order specifies 394 positions in addition to the four required for Probation–IPS. At the time of the panel report, there were 347 filled full-time positions excluding the four in IPS. The forty-seven positions that the Assignment Judge

wanted to fill were vacancies that occurred during the year and have gone unfilled because of the County's failure to provide hiring approvals.

. In reaching its conclusion regarding appropriations for the Probation Department, the panel reviewed a report prepared by Touche Ross & Co. entitled "Essex County Probation Department, Management and Operations Review August 3, 1987." EXH. J–7. The review conducted by Touche Ross was "aimed at providing ways the Department can continue or improve the current level of service using current staffing levels." As the panel observed, the report revealed that "case loads are seriously overburdening staff workers, morale is low, improper shortcuts are being taken in handling present assignments and ... supervisors are reluctant to fire incompetent staff because they know the County will not fill the vacancy." Panel Report at 13. The panel read the report to imply that implementation of its recommendations would result in "present staffing levels being able to handle the work load through the updating of techniques, greater efficiencies achieved through employing new methods and elimination of non-productive work." Id. Thus, the panel concluded that the Touche Ross report supported the County's position that the department could be improved without additions to the current staff. Consequently, it denied the Assignment Judge's request to fill the forty-seven vacancies.

The panel did find that the Touche Ross report supported the Assignment Judge's position that the department needed five additional child support investigators. Accordingly, the panel recommended that the Department hire five child support investigators at a cost for the remainder of 1987 of $19,334.

The panel, however, noted the need to have future vacancies in the department promptly filled. "The Touche Ross recommendations are highly dependent on the ability of supervising personnel to control their staff and to replace such personnel as are not fully performing the required tasks. This can only be

accomplished if supervisors know that replacement personnel will be appointed quickly when requested." Panel Report at 13–14.

Thus, the panel recommended the following additional appropriations:

| | |
|---|---:|
| Library | $ 32,861 |
| Jury | 53,705 |
| Special Civil Part | 50,938 |
| Law Division | 630,448 |
| Family Part | 11,632 |
| County Clerk-Judicial | 303,251 |
| Probation and IPS | 853,154 |
| Probation Officers—4% Increase | 180,000 |
| TOTAL | $2,115,989 |

### III

Both the County Executive and the Assignment Judge filed exceptions to the panel's recommendations pursuant to *Rule* 1:33–9. Both parties acknowledge that the $2,115,989 figure is overstated by $219,952.[4] Of that amount, $180,000 represents compensation for the members of the Probation Department for their extra half hour of work. However, the panel incorrectly entered that sum twice: once as part of the overall Probation Department budget and, again, as a separate item. The panel also double-entered $39,952 as part of the projected shortfall for the Probation Department and, as a separate item, for Probation–IPS.

The County contends that the panel recommendation should be reduced by at least $525,351 to $1,590,638. Specifically, it claims the panel recommendation should be reduced as follows:

---

[4]While the Assignment Judge admits that the panel double-entered this sum, he contends that the amount should not be subtracted from the total since even the total is below what he claims is necessary.

| | | |
|---|---:|---:|
| Panel Recommendation | | $2,115,989 |
| Denying probation officers' 4% increase | $180,000 | |
| Denying salaries for judges' secretaries and 2 law clerks in the Law Division and correcting overestimation of Law Division shortfall | 50,947 | |
| Denying funding for a law clerk | 6,000 | |
| Modifying funding level for 3 clerk typists and 2 court aides in Special Civil Part and reclassifying position of principal clerk | 7,306 | |
| Correcting funding level for promotions in Family Part and denying funding for 2 positions | 17,230 | |
| Subtracting duplicate appropriation for Probation Officers' 4% increase, duplicate calculations for IPS projected expenditures and overestimated shortfall from Probation appropriation | $263,868 | $ 525,351 |
| | | $1,590,638 |

The Assignment Judge, in his exceptions to the panel report, contends that an additional appropriation of $2,432,108 is reasonably necessary. That total is calculated as follows:

| | |
|---|---:|
| Panel Recommendation | $2,115,989 |
| 5% Increase for Probation Officers under contract | 221,625 |
| 11 Probation Dept. vacancies | 48,933 |
| Law Library staff | 17,354 |
| 3 Law Clerks | 28,207 |
| | $2,432,108 |

We resolve the impasse by ordering an additional appropriation of $1,990,531. In so doing, we adopt primarily the panel's recommendation. Working from the panel's recommendation of $2,115,989, this Court calculated the sum ordered as follows:

| | |
|---|---|
| Panel Recommendation | $2,115,989 |
| 11 Probation Dept. vacancies | 48,933 |
| Law Library positions | 17,354 |
| Family Part law clerks | 28,207 |
| Less: | |
| Reductions for duplications in Probation Dept. | (180,000) |
| Appropriation | (39,952) |
| TOTAL | $1,990,531 |

This additional appropriation reflects what we consider "reasonably necessary" to the continued effective administration of the Essex County judiciary for 1987. Like the panel, this Court is aware of the fiscal crisis faced by Essex County. As we stated in *Matter of the Camden County 1987 Judicial Budget Impasse, supra,* 109 *N.J.* at 29, "we are concerned about the County's acute problem and recognize its efforts to reach a solution." Hence, we evaluate the Assignment Judge's "request for additional resources to operate an efficient judicial system in light of the resources available to county governments to fund those operations." *Id.* at 25.

Nonetheless, we are mindful of the need to provide sufficient funding for the judiciary system in Essex County to function in an efficient and effective manner. Residents of Essex County are entitled to the same level of performance from the judiciary as provided elsewhere in the State.

While recognizing that county budget practices are of undoubted assistance in analyzing judicial budgets, a "qualitative analysis" of the panel's recommendations must be made to determine the level of funding at which the courts of Essex County can properly administer justice. *Matter of Camden County 1987 Judicial Budget Impasse, supra,* 109 *N.J.* at 29.

The Essex County judiciary responded to the County's fiscal crisis by instituting a hiring freeze in early 1987 and except in emergency situations did not fill vacancies within the judiciary.

Simultaneously, the caseload of the Essex County courts has continued to grow. For all courts combined, approximately 137,000 cases were filed in Essex County for the court year 1987.

There is also a substantial backlog of cases in Essex County. Mr. Edwin Kennedy, Chief of Statistics for the Administrative Office of the Courts, testified at the panel's hearings that Essex County has "monstrous problems ... with regard to backlog." For example, two out of every three criminal cases in Essex County are over four months old and 58% of all civil cases are over twelve months old. We emphasize that there has been no indication that members of the Essex County judiciary do not use their time productively. In fact, the evidence has been to the contrary. Indeed, the County alleges that Essex County judges are so efficient that the additional requested positions recommended by the panel are not "reasonably necessary" to the efficient operation of the courts.

The Essex County judiciary is thus pressured on both sides. It is faced with the weight of an increasingly heavy caseload and the need to cooperate with the county government in keeping expenses to a minimum. Obviously, the problem is a difficult one, and a complete understanding of the needs of both the county government and the county judiciary is essential to its resolution.

Our review of the record demonstrates that the panel conducted a thorough and searching examination of the judiciary's needs against the backdrop of the County's present fiscal condition. The panel heard extensive testimony from county judicial and executive officers, state judicial personnel, and court administration experts. Prior to reaching its conclusions, the panel considered many internal and outside appraisals of the Essex County judicial system. We find that the panel's conclusions represent a balanced view of what is "reasonably necessary" to continue the effective administration of justice in

Essex County. Therefore, we adopt the panel's recommendations with three limited exceptions.

We believe that appropriations should be increased in the amount of $94,494: (1) to fill eleven vacancies in the Probation Department; (2) to fund the existing positions of Librarian and clerk typist in the County Law Library; and (3) to provide three law clerks for judges in the Family Part.

### A. Probation Department

The Assignment Judge argues that appropriations to fill eleven vacancies in the Probation Department are necessary to maintain the staff at the level that the Touche Ross review confirmed to be necessary for efficient operation of the Department. According to the Touche Ross report, the Department may be efficiently run with 358 employees.[5] That was the number of filled positions at the time that Touche Ross concluded that the "existing staff" was sufficient to provide effective and efficient probation services. The total staff in the Essex County Probation Department as of September 1, 1987, was 347. Therefore, the Department needs to hire eleven more probation officers, investigators, and clerks in order to provide effective service as outlined in the Touche Ross review. We do not mean to adopt Touche Ross' conclusions. We are simply attempting to achieve what appears to be a sensible level of personnel given the fiscal problems that exist. We do not mean to foreclose the Assignment Judge from requesting an increase in probation personnel in the future.

Probation officers are an integral part of our court system and "play an important and indeed vital role in the administra-

---

[5]Although the panel intended to adopt the Touche Ross recommendation that the Probation Department be maintained at current staffing levels, the Touche Ross report contained an incorrect staffing chart, which reflected a current staffing level of 345. That chart erroneously omitted thirteen administrative personnel. Thus, the accurate number of total staff in the Probation Department at the time of the Touche Ross report was 358.

tion of justice, both in criminal and civil courts throughout the state." *Passaic County Probation Officers' Ass'n v. County of Passaic, supra,* 73 *N.J.* at 253; *Essex County Welfare Bd. v. Perkins,* 133 *N.J.Super.* 189, 196 (App.Div.), certif. denied, 68 *N.J.* 161 (1975). Supervision of probationers by Department staff enables these individuals to remain outside of jail and support themselves. The Probation Officers also participate in and provide information essential to programs in the Criminal Part aimed at early disposition of criminal matters. Without the help of probation officers many more criminal matters would be assigned to judges.

Moreover, Probation Officers frequently conduct conferences to resolve late child support disputes and secure payment agreements thereby avoiding the necessity for enforcement proceedings before a judge. Approximately $26,000,000 in child support payments was collected by the Essex County Probation Department in 1986. This money enables the custodial parent to feed and clothe his or her children and reduces the likelihood that they will require public welfare assistance. It is thus absolutely essential that the judiciary maintain the Probation Department's staff at an adequate, functioning level.

The eleven positions authorized by our order and their corresponding appropriations, pro-rated for the remainder of 1987, are:

| | |
|---|---:|
| 5 Probation Officers (2 in Criminal Case Management and 3 in Supervision) | $26,333 |
| 3 Investigators (for Criminal Case Management) | 11,600 |
| 3 Clericals | 11,000 |
| TOTAL | $48,933 |

### B. *Law Library*

We disagree with the panel regarding the appropriations reasonably necessary for operation of the County Law Library. The panel recommended that the positions of Librarian and

clerk typist in the library be eliminated. The panel suggested that law clerks could maintain the library on a rotating basis.

The Assignment Judge contends that this use of law clerks would substantially dilute their effectiveness in assisting judges and would have direct and adverse consequences to the operation of the library. We agree. A properly managed, complete, and current library is indispensable to the administration of justice in Essex County. Equally indispensable is the support given judges by their law clerks. Therefore, we have added $17,354 to the appropriations to cover the cost of the library's full-time support staff.

C. *Family Part Law Clerks*

We also find that an appropriation is necessary for three additional law clerks in the Family Part. The panel recommended against this appropriation noting that certain matters handled by the Family Part such as juvenile, domestic violence, and child support do not require law clerks, and that when the assistance of a law clerk is necessary, law clerks assigned to judges in other parts of the court could do the work. We disagree.

In addition to all the traditional matters handled by the Family Court, the relatively recent reorganization of that court has added new areas of jurisdiction that will require more legal research (*e.g.*, adoption, mental health, etc). Furthermore, the motion practice in such areas as paternity, custody, and visitation has grown and continues to grow. The Family Court judges also have various administrative assignments.[6] Law clerks provide assistance to the judges in handling all these

---

[6] A Family Court judge may be assigned to review proposed orders prepared by the welfare and probation sections of the Office of Child Support Enforcement, to review calendars and proposed orders prepared by the Child Support Hearing Officers Program, to review proposed orders prepared by the County Adjustor regarding the status of civilly committed persons, or to review interstate compacts for juveniles, underage marriage investigations, etc.

matters. Finally, law clerks in the Family Part assist in mediation of dissolution and non-dissolution cases.

Each Family Court judge thus needs the assistance of his or her own law clerk. It is essential to the effective operation of the Family Part. The additional appropriation for 1987 to fund the pro-rated cost of three new law clerks is $28,207.

Although we increase the panel's recommendation by $94,-494, we also decrease its recommendation by $219,952, to reflect the duplications for the Probation Officers' 4% increase and the cost of IPS. The panel included these sums as separate items and within the general appropriation for the Probation Department.

IV

The end result, therefore, is that we reduce the panel's recommendation of $2,115,989 by $125,458. See *supra* at 102 –103. Accordingly, we order that the 1987 judicial budget for Essex County of $18,521,431 be increased by $1,990,531 as of September 1, 1987, so that the total amount appropriated for the judiciary for 1987 shall be $20,511,962.

We conclude that much more needs to be done, particularly in the initial budget stages, to resolve the fiscal problems between the County and the Assignment Judge. We recognize that the different timing of the budgeting cycles for the State and County creates serious and complex problems. These problems, however, are exacerbated by the County's delay in approving personnel requests. Such delays lead not only to shortages in staff, but also to a reluctance on the part of supervisors to discharge inefficient workers for fear of not receiving any replacements. Thus, we urge that the County act on the Assignment Judge's personnel requests within twenty-one days. Unless full funding of the judiciary is timely made the judiciary remains underfunded for a substantial part of the year. Thus, as we stated in *Matter of Camden County 1987 Judicial Budget Impasse*, *supra*, 109 *N.J.* at 38, "civil and

criminal dockets of the county involved will show the effect, in quality, quantity, or both, of such underfunding. The public in turn will bear the consequences."

Clearly, more communication between the judiciary and the County in improving the budget process is necessary. We believe that with greater awareness of each other's problems, County and judiciary officials working together will be able to improve the budgeting process. The public deserves no less.

*For modification*—Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK, O'HEARN, STEIN and GARIBALDI—6.

(Justice HANDLER did not participate.)