STATE OF NEW JERSEY, v. RUSSELL E. RUSH,
DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, v. ELVERT LEE COUCH,
DEFENDANT-APPELLANT.

Argued October 25, 1965—Decided March 7, 1966.

400

*Mr. Martin L. Haines* argued the cause *pro se.*

*Mr. Sanford Soren,* Assistant County Solicitor, argued the cause for respondent County of Burlington.

*Mr. John W. Hayden, Jr.,* Deputy Attorney General, argued the cause for the State of New Jersey as *amicus curiae* (*Mr. John A. Waldron,* Deputy Attorney General, of counsel and on the brief; *Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. These matters involve the question whether counsel assigned to defend indigents charged with crime is entitled to receive from the county or the State compensation for services and reimbursement of out-of-pocket expenses. In the one case, the charge was armed robbery. In the other, the charges were assault with intent to kill, atrocious assault and battery, and carrying a concealed weapon. The applications for allowances and reimbursement were denied by the trial court, *State v. Rush,* 87 *N. J. Super.* 49 (*Cty. Ct.* 1965), and we certified counsel's appeals before argument in the Appellate Division.

The only statute expressly dealing with the subject of compensation is *N. J. S.* 2A:163–1, which provides for payment to assigned counsel "in a murder case." We have heretofore accepted this statute as the exclusive basis for compensation for services. Thus in *In re Steenback,* 34 *N. J.* 89 (1961), we denied compensation to counsel assigned to represent a minor charged with juvenile delinquency involving homicide on the ground that the situation was beyond that statute, and in *State v. Donaldson,* 36 *N. J.* 45 (1961), we denied compensation to assigned counsel where there was a homicide but the grand jury failed to return an indictment for murder. In both cases we referred to the ancient professional duty of a member of the bar to respond to a court's assignment, and in *State v. Horton,* 34 *N. J.* 518 (1961), we took that obligation into account in deciding the amount of

compensation which should be paid in a murder case under the statute to which we have referred. But while we thus limited compensation to murder cases, the subject of that statute, we stressed the need for a comprehensive examination of the problem and reserved the question whether the power and responsibility for change rests with our Court. *State v. Donaldson, supra,* 36 *N. J.,* at *p.* 50.

In *Horton* we explored the history of the accused's right to counsel. Since it is a backdrop for the issue before us, we will summarize it.

The common law did not assure all accuseds a right to ˙retain counsel. In England, at the time of the American Revolution, one charged with a misdemeanor could defend through counsel, but as to felonies other than treason he could enlist the aid of counsel only upon points of law, and that remained the rule in England until 1836. *Betts v. Brady,* 316 *U. S.* 455, 465–468, 62 *S. Ct.* 1252, 86 *L. Ed.* 1595, 1603–1605 (1942); *State v. Horton, supra,* 34 *N. J.,* at *p.* 523, fn. 2; *Donnelly v. State,* 26 *N. J. L.* 601, 606 (*E. & A.* 1857); 1 *Cooley, Constitutional Limitations (8th ed.* 1927), *pp.* 696-708; *Beaney, Right to Counsel* (1955), *pp.* 8–12; Annotation, 130 *A. L. R.* 1439 (1941); Annotation, 36 *L. R. A., N. S.,* 377 (1912).

This restriction upon the right to enlist the aid of counsel was rejected in New Jersey's *Constitution of* 1776 which provided in *Art.* XVI "That all criminals shall be admitted to the same privileges of witnesses and counsel, as their prosecutors are or shall be entitled to." Our State was perhaps the first to legislate the further right for an accused who is indigent to have counsel assigned without charge. *State v. Horton, supra,* 34 *N. J.,* at *pp.* 522–523. Thus the act of March 6, 1795 (*Paterson, Laws* 162 (1800)) provided:

"That the court before whom any person shall be tried upon indictment, is hereby authorized and required to assign to such person, if not of ability to procure counsel, such counsel, not exceeding two, as he or she shall desire, to whom such counsel shall have free access at all reasonable hours."

As observed in *Horton, supra,* 34 *N. J.,* at *p.* 523, the provision of *Art.* I, ¶ 8, of the *Constitution of* 1844 that "In all criminal prosecutions the accused shall have the right * * * to have the assistance of counsel in his · defense" could be understood in the light of our own history, not only to assure a right to retain counsel, but also to fix in constitutional terms the further right, created by the 1795 statute, for the assignment of counsel to an accused unable to afford his own. Finally we add that the United States Supreme Court has found the Federal Constitution requires the State to furnish counsel to an indigent accused of crime. *Gideon v. Wainwright,* 372 *U. S.* 335, 83 *S. Ct.* 792, 9 *L. Ed. 2d* 799 (1963).

That, in brief, is the history of the right of the indigent accused. We are here concerned with the burden of supplying the indigent with a free defense. As to this, there is no doubt that it was the professional obligation of the English and the American attorney to accept an assignment to represent an indigent defendant, and except for Indiana, Iowa, and Wisconsin, the view in our country has been unanimous that there is no enforceable right to compensation. *State v. Horton, supra,* 34 *N. J.,* at *p.* 525; Annotations, 144 *A. L. R.* 847 (1943); 130 *A. L. R.* 1439 (1941); 36 *L. R. A., N. S.,* 377 (1912). The majority position seems to be that there is no power to order payment in the absence of a statute providing for it, while Indiana and Wisconsin, found their constitutions required compensation, *Knox County Council v. State ex rel. McCormick,* 217 *Ind.* 493, 29 *N. E. 2d* 405, 130 *A. L. R.* 1427 (*Sup. Ct.* 1940); *County of Dane v. Smith,* 13 *Wis.* 585, 80 *Am. Dec.* 754 (*Sup. Ct.* 1861), and Iowa, the other minority State, found authority for payment to be implicit in a statute which, like our act of 1795 quoted above, authorized or directed the assignment of counsel. *Ferguson v. Pottawattamie County,* 224 *Iowa* 516, 278 *N. W.* 223 (*Sup. Ct.* 1938).

But although the majority view thus places the burden upon the members of the bar, no one suggests they may not

constitutionally be relieved of it. Indeed, the vast majority of the state legislatures have provided for some compensation for assigned counsel, *Silverstein, Defense of the Poor* (1965), *pp.* 16, 253, and recently the Congress provided for compensation with respect to offenses other than petty ones, Criminal Justice Act of 1964, 18 *U. S. C. A.* § 3006A. As we have already mentioned, our Legislature has provided for compensation in murder cases, *N. J. S.* 2A:163–1. The legislative bill from which that statute stemmed did not confine compensation to murder cases. It was so amended before passage, *State v. Horton, supra,* 34 *N. J.,* at *p.* 527, *n.* 5, but not, we may safely assume, for doubt as to the constitutional power of the State to provide for payment.

## I.

Appellant claims the Constitutions, State and Federal, require that compensation be paid. He not only asserts that certain provisions protect a lawyer from an order to defend without compensation, but he also contends the right of the accused himself to the aid of counsel leads to the same result.

## A.

In strictness counsel for an indigent defendant is hardly in a position to claim compensation on the ground that the rights of his assigned client have been infringed. However, we appreciate that counsel's purpose is to place a pressing problem before us rather than to gain a dollar result for himself. In fact, he expressly asks that, should he prevail, the award for his services be limited to six cents. To the end that all phases of the issue may be in view, we will assume he has the status to press the constitutional claims of defendants charged with crime.

As to the right of an accused, appellant contends that counsel, if unpaid, cannot by his performance satisfy the constitutional guarantee of the right to the aid of counsel. We know of no data to support a claim that an assigned at-

torney fails or shirks in the least the full measure of an attorney's obligation to a client. Our own experience, both at the bar and on the bench, runs the other way. A lawyer needs no motivation beyond his sense of duty and his pride.

Nor can it be said that assigned counsel are less qualified than counsel privately retained. As in other callings, some men acquire reputations for excellence. In numbers they are few, and sometimes it is not clear why fortune has chosen them alone. It is understandable that a defendant will seek a lawyer of wide repute if he can afford him, but of course the Constitution does not assure every man, indigent or not, that only a leader of the bar will speak for him. Even the State cannot command such representation; most criminal cases are prosecuted by young men who have yet to be acclaimed but who are not in the least unequal to their responsibility on that account. Nor does preeminence at the bar necessarily bespeak special experience in criminal matters. In the State courts, criminal work is not too rewarding financially. Very few specialize in that area, and overall the well known lawyers have had but sporadic exposure to it.

Nor is prior experience in criminal matters essential. The law is a vast field and no man is in command of all of it. Lawyers, as do judges, move from scene to scene, absorbing the special features of each. A capacity to that end goes to the essence of the practice of law. A lawyer's training equips him for it, and his every experience sharpens that skill. And although a new scene may demand a greater initial effort, the newcomer may well bring a zeal and a freshness long lost to a tired or comfortable expert.

Moreover, few cases really turn upon the skill of the advocate. The facts and the applicable law are quite compelling, and a lawyer who has both on his side will do well against anyone. No doubt a small number of cases are lost through lack of skill or poor preparation, but while the legal profession, like all others, suffers to a degree from the inept and the indolent, the phenomenon cannot be said to be related to a system of assignment of counsel. Further, illogical though

it may be, judges tend to have a larger sense of responsibility for the performance of lawyers they assign than for the performance of counsel privately retained, and to the extent that this is true, there may be an advantage for the indigent accused.

We are satisfied our system of assignment[1] yields representation equal to that obtained by defendants who retain their own counsel. This is not to say that another approach would not be more desirable. Rather our point is that what we have meets the constitutional demand, and to recur to the precise point counsel here seeks to make, we are satisfied that our assignment system does not fall short because assigned counsel are unpaid.

## B.

██ We turn to the constitutional claims advanced by counsel in his own right. They are that an assignment without compensation for services takes private property for public use without just compensation (*N. J. Const., Art.* I, par. XX; *U. S. Const.,* 5th and 14th Amendments), takes property without due process of law and denies equal protection of the law (*N. J. Const., Art.* I, *par.* I; *U. S. Const.,* 14th Amendment), constitutes involuntary servitude (*U. S.*

---

[1] *R. R.* 1:12–9(e) reads:

"As far as practicable all assignments of counsel, whether by a trial or appellate court, shall be made in alphabetical rotation from a master list to be maintained by the assignment judge or other judge designated by him and administered by the assignment clerk, if any; except in cases of murder and where in the opinion of the court the gravity of the offense warrants the assignment of special counsel. The master list shall include all members of the bar practicing within the county, unless excused by the assignment judge or other judge maintaining the list on written application setting forth good cause. Counsel assigned to represent an indigent defendant pursuant to this rule may, with the approval of the court making the assignment, secure other counsel, to serve in his stead, in which case credit for the assignment on the master list shall be given to counsel initially assigned and not to substituted counsel. Law clerks and law students shall be assigned to assist assigned counsel, wherever possible, in the investigation and preparation of assigned matters."

*Const.,* 13th Amendment) or peonage prohibited by federal law, 42 *U. S. C. A.* § 1994.

None of these contentions is new, and if one accepts the premise that the duty to defend the poor is a professional obligation rationally incidental to the right accorded a small segment of the citizenry to practice law, these claims fall away. Essentially the same claims were rejected recently in *United States v. Dillon,* 346 *F.* 2d 633 (9 *Cir.* 1965), *cert.* denied 86 *S. Ct.* 550 (1966), and *State v. Clifton,* 247 *La.* 495, 172 *So.* 2d 657, 667 (*Sup. Ct.* 1965). Indeed in *Powell v. State of Alabama,* 287 *U. S.* 45, 73, 53 *S. Ct.* 55, 65, 77 *L. Ed.* 158, 172 (1932), the Supreme Court assumed without pause that attorneys were so obligated, saying "Attorneys are officers of the court, and are bound to render service when required by such an appointment," and although the Supreme Court did not add "without compensation," the context makes it clear that uncompensated service was in mind. The Supreme Court of course did not mean that the ultimate obligation to furnish counsel reposed in the bar rather than in the State, for quite plainly the obligation the Court there found and later expanded in *Gideon v. Wainwright, supra,* 372 *U. S.* 335, 83 *S. Ct.* 792, 9 *L. Ed.* 2d 799, is the obligation of the State itself rather than the personal obligation of any of its officers, but *Powell* did assume that, if attorneys as officers of the Court were called to serve without pay, no constitutional restraint stood in the way.

Conceivably the burden upon the bar could reach such proportions as to give the due process argument a force it does not now have. We have not reached that extraordinary stage. Nonetheless, and far short of that point, there is the policy question whether in fairness the bar alone should be required to discharge a duty which constitutionally is the burden of the State.

■ Before turning to that policy question, it is convenient to consider at this juncture the further constitutional claim, that *N. J. S.* 2A: 163–1, which authorizes compensation for assigned counsel in murder cases, is invalid because the line

drawn between murder and other offenses is arbitrary and therefore denies equal protection of the law. We see no substance to the attack. The Legislature could find that murder cases differ in degree in their demand upon counsel, *David v. Vesta Co.*, 45 *N. J.* 301, 314–315 (1965); *Robson v. Rodriquez*, 26 *N. J.* 517, 524 (1958); *New Jersey Restaurant Ass'n v. Holderman*, 24 *N. J.* 295, 300–301 (1957), and in any event, appellant could gain nothing if the statute fell because it did not go far enough.

█ Nor do we see substance in the further charge that our system of assignment casts an unequal burden as among members of the profession. Our rule of Court[2] is designed to distribute the burden equally, subject only to such variations as may be dictated by the complexity of a case or other considerations relevant to the objective of full, competent representation. The rule seeks to assure such equality of treatment as the subject will permit, and since it is not shown that the plan itself has been enforced unequally, let alone invidiously, we find no denial of equal protection.

## II.

We come then to the important policy issue whether the members of the bar should continue to bear alone the constitutional duty of the State to provide counsel for the indigent. The issue presents several questions: (A) whether the judiciary has the authority to deal with the subject; (B) if it does, whether that relief should be ordered; and (C) whether authority presently exists for payment by the county or some agent of the State. We reserved these questions in *Donaldson, supra,* 36 *N. J.*, at *p.* 50. Now, five years later, they must be answered.

## A.

██ We have no doubt as to our authority to deal with this subject. If we assume for the moment that the obligation

---

2 See *R. R.* 1:12–9(e) quoted in footnote 1 above.

of the lawyer is part of the substantive common law within the ultimate control of the Legislature, the power of the judiciary to keep the common law responsive to the demands of a changing scene, in the absence of the Legislature's expression of its will, is settled. *Collopy v. Newark Eye and Ear Infirmary,* 27 *N. J.* 29 (1958) ; *Cohen v. Kaminetsky,* 36 *N. J.* 276 (1961). In this connection we note that if the act of 1795, quoted above, be thought to have imposed an obligation upon the bar to defend without compensation (literally, at least, the statute did not), still no legislative expression would now relieve us of our responsibility since that statute, which had continued in its essence as part of *R. S.* 2 :190–3, was repealed in the revision of Title 2 effective January 1, 1952.

Indeed it is the special, and as we shall see in a moment, the exclusive responsibility of the judiciary to determine the obligation of the legal profession in this area. The duty to defend the indigent without charge is not a personal duty in the conventional sense of an obligation owed by one man to another, for the breach or nonperformance of which that other is entitled to dollar or other relief. A lawyer does not owe free representation to any and every indigent who chooses to demand it of him. Rather the duty is owed to the Court, and it is the Court's call that he is obliged to answer. The duty is to assist the Court in the business before it. The duty thus is an incident of the license to practice law, and the power to deal with it must therefore repose in the branch of government charged with responsibility for the terms and conditions of the right to practice.

It is generally held that the courts have the inherent power to decide who shall practice law. In those cases decided elsewhere in which the legislature was found to have a voice, the legislative authority was deemed to be in aid of the final judicial responsibility and to extend no further than the prescription of minimum requirements, the judiciary remaining free to demand still more. Frequently such statutes have been accepted by the judicial branch in a spirit of comity

rather than out of constitutional compulsion. The many cases dealing with this subject are discussed in Annotation, 144 *A. L. R.* 150 (1943).

 In our State, prior to the *Constitution of* 1947, there was the apparently unique arrangement under which attorneys were commissioned by the Governor, upon, however, the recommendation of the former Supreme Court. The arrangement was unique because an attorney is not an officer of the State in a constitutional sense but rather is an officer of the Court itself and of the Court alone. *In re Raisch,* 83 *N. J. Eq.* 82 (*Ch.* 1914); see also *In re Garland,* 4 Wall. 333, 71 *U. S.* 333, 18 *L. Ed.* 366, 370 (1867); *In re Integration of Nebraska State Bar Ass'n,* 133 *Neb.* 283, 275 *N. W.* 265, 267, 114 *A. L. R.* 151 (*Sup. Ct.* 1937). At any rate prior to the 1947 Constitution the executive did participate in the process. The precise scope of executive authority seems not to have been examined, but the role of the Legislature was considered in *In re Branch,* 70 *N. J. L.* 537 (*Sup. Ct.* 1904). There a statute which attempted to fix qualifications for admission to the bar was held to be void as an invasion of the inherent authority of the judiciary.

The decision in *Branch* was reached without the aid of express constitutional support since the *Constitution of* 1844 was silent upon the topic. Now the subject is expressly covered. The *Constitution of* 1947 provides in *Art.* VI, § II, ¶ 3:

"\* \* \* The Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted."

Thus the State Supreme Court is invested with exclusive responsibility in this area. *New Jersey State Bar Ass'n v. Northern New Jersey Mortgage Associates,* 32 *N. J.* 430, 436–437 (1960). Accordingly, after the adoption of the *Constitution of* 1947, the Legislature in its revision of Title 2 of the Revised Statutes, effective January 1, 1952, repealed Chapters 21 through 23, which had dealt with procedural aspects of the licensure and discipline of lawyers. At the

same time, as we noted above, the Legislature repealed so much of *R. S.* 2:190–3 as embodied the essence of the statute of 1795, quoted above, and if that statute should be thought to have imposed upon the legal profession a duty to defend the indigent without charge, its repeal could be regarded as a recognition of the proposition that the subject is part and parcel of the subject of membership at the bar, a subject now explicitly the exclusive constitutional responsibility of the judicial branch of government.

## B.

The next question is whether we should continue to require members of the bar to absorb the full cost of the defense of the indigent. We think we should not.

Although as we said above the assignment of counsel without compensation (except in murder cases) has been the rule in this State since 1795, the burden of those assignments has increased vastly. The increase has been not only in the number of assignments, but also in the demand a criminal case makes upon counsel. A criminal case used to be a fairly simple affair. The issue usually was a pure question of fact —did the defendant commit the crime? Today, with rapidly changing concepts relating to sundry matters, such as confessions, search and seizure, joinder of defendants, right to counsel, etc., the defense of criminal charges consumes far more time than when we came to the bar. To this must be added the impact of the right of the indigent, without cost, to appeal, and to press post-conviction proceedings and as well attacks in the federal courts. Further, the total demand will likely increase, for while criminal proceedings now dominate the stage, in the wings are other matters—minor offenses, juvenile delinquency, and civil commitments, areas in which counsel are now furnished but on a selective basis. We are satisfied the burden is more than the profession alone should shoulder, and hence we are compelled to relieve the profession of it.

The burden thus passing to the taxpayers, the members of the bar, as taxpayers, will of course share in it. But for the time being at least, we think the members of the bar should contribute something more, despite still other calls upon them for gratuitous service.[3] To that end, the compensation should be less than that expected of a client who can pay. The rate should reimburse assigned counsel for his overhead and yield something toward his own support. In approximate terms the overhead of the average law office probably runs about 40% of gross income. To meet that expense and yield something to assigned counsel, we suggest compensation at 60% of the fee a client of ordinary means would pay an attorney of modest financial success.

## C.

In deciding whether we should thus relieve the bar of the exclusive burden of the defense of the indigent, we considered the question whether authority now exists for the payment of these allowances. We did so, not for fear that criminal charges would be dismissed wholesale because of the State's default in its constitutional obligation to provide counsel, for if legislation were necessary, it is idle to suppose it would not be enacted. Rather we explored the question to the end that the agencies of government may know where the burden will fall under the existing statutes and may prepare to meet it.

In this connection we merely note, without exploring the subject at all, the question whether the judiciary has the inherent power to order payment in the absence of statute. See 14 *Am. Jur., Courts* § 171, *p.* 371; 20 *Am. Jur. 2d, Courts* § 79, *p.* 440; *Leahey v. Farrell*, 362 *Pa.* 52, 66 *A. 2d*

---

3 In keeping with the traditions of the bar, its members contribute unstintingly of their time upon the request of the Court and without remuneration. Some 230 members of the bar serve upon the Advisory Committee on Professional Ethics, the Ethics Committees, and the Character and Fitness Committees of the Supreme Court. Hundreds more serve on other committees of the Supreme Court and of the bar associations in continuous study of the judicial system.

577 (*Sup. Ct.* 1949). We need not explore that matter since we find ample evidence of a legislative will that the cost of criminal prosecutions shall be paid by county government and there is no reason to say the costs we are now considering are of another nature.

That the county must meet the cost of criminal prosecutions is clear. The county is a subdivision of the State, constituted to perform certain functions of State government, *Bergen County v. Port of New York Authority,* 32 *N. J.* 303, 312 (1960), and among them is the prosecution of criminal causes. It is generally held that the county is liable for the expenses involved, either by virtue of express statutory provision or by necessary implication from the statutory scheme. 20 *C. J. S. Counties* § 210, *pp.* 1058–59; *cf. Godfrey v. McGann,* 37 *N. J.* 28 (1962).

In our State, the legislation is explicit. *N. J. S.* 2A:158–4 provides that the "criminal business of the state shall be prosecuted exclusively" by the county prosecutor, and *N. J. S.* 2A: 158–5 provides the prosecutor "shall use all reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders against the laws." See *State v. Winne,* 12 *N. J.* 152, 167 (1953). *N. J. S.* 2A:158–7 provides that the county treasurer shall pay "All necessary expenses incurred by the prosecutor for each county in the detection, arrest, indictment and conviction of offenders against the laws," even in excess of the sums appropriated if such further expenditures are authorized by the assignment judge. And when the Attorney General undertakes to prosecute the criminal business of the State in a county, the county treasurer, upon the court's order, must pay for the services rendered. *N. J. S.* 52:17A–5. See *Van Riper v. Board of Chosen Freeholders,* 137 *N. J. L.* 714 (*E. & A.* 1948); *County of Hudson v. Zink,* 135 *N. J. L.* 1 (*Sup. Ct.* 1946).

Thus the "necessary expenses" of the prosecution are the burden of the county. Within that category must fall the expense of providing counsel for an indigent accused, with-

out which a prosecution would halt and inevitably fail under *Gideon. v. Wainwright, supra,* 372 *U. S.* 335, 83 *S. Ct.* 792, 9 *L. Ed.* 2d 799.

Although statutory provision thus exists to meet the costs of the constitutional mandate to provide counsel for the indigent, nonetheless there are practical problems which persuade us to delay the effective date upon which the members of the bar will be relieved of the burden they now bear alone. *Cf. Switz v. Middletown Twp.,* 23 *N. J.* 580 (1957). The Legislature should have an opportunity to decide whether this obligation of the State should be met by the present system of assignment in individual cases, or by a public defender, or some combination of both. There are advantages in centralizing the defense wholly apart from the question discussed above, *i.e.,* whether the indigent defendant fares as well under an assignment system as does the non-indigent defendant. An established office with personnel immediately available should be able to respond more quickly to a need for counsel, to provide investigatorial services at the optimum time, and to serve the indigent in other areas involving penalty or confinement whether or not the Constitutions command that aid. There is also the matter of cost; the compensation of each assigned attorney together with the separate retention of investigators where that need exists would likely aggregate more than the cost of another approach, particularly in the populous counties. Then, too, the Legislature may wish to consider whether the substantial sums involved should be met in whole or in part at State level rather than by the local taxpayer alone.

It is not our purpose here to express a view upon these issues. We do no more than recognize the desirability, in the public interest, for an opportunity for the other branches of government. and the agencies concerned to consider the problem. To that end, compensation for services will not be paid with respect to assignments made prior to January 1, 1967, except of course in murder cases.

## III.

Finally, the matter of counsel's out-of-pocket expenditures. We dealt with that subject in *State v. Horton, supra,* 34 *N. J.,* at 534–535. We there said that counsel is entitled to reimbursement as to such items (with a caveat that advance authorization should be sought as to some), and that such reimbursement should also be made in "non-murder" cases.

The trial court here regarded that expression as "dictum." *Horton* did involve a murder charge, but we deliberately dealt with "non-murder" cases as well and hence whether our expression technically was "obiter" or not, trial courts should abide by it. We assume the trial court here would have, except for a misunderstanding as to our statement in *Horton* (34 *N. J.,* at *p.* 535) that "Since this has not been the general practice in non-murder cases, at least as to attorneys' disbursements, the view just expressed should be considered as prospective only." The trial court read this to mean that reimbursement depended upon the later adoption of a formal rule of court.

We intended our view to be effective at once although not to be applied to past transactions. The adoption of a formal rule was not in mind. Nor was one necessary. The obligation of the State to provide the indigent with the means for an appropriate defense rises from an interplay of the constitutional rights to counsel, to a fair trial, and to equality before the law. The obligation of the county to pay rises from the statutes already discussed. Neither the obligation of the State nor the obligation of the county depends at all upon an exercise of our constitutional power to make rules governing "the practice and procedure" in all courts, *Art.* VI, § II, ¶ 3.

Hence counsel was entitled to reimbursement as to the specific disbursements in question, and the judgments must be modified accordingly.

The matters are remanded to the trial court to the end that appellant be reimbursed for his out-of pocket expenses. Otherwise the judgments are affirmed. Appellant having prevailed in principle, although without monetary award, with respect also to the larger issue involved, costs on this appeal are allowed to him and against the county.

*For modification*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*Opposed*—None.