601 *A.*2d 211

JOHN LEE MADDEN, ALLEN S. FERG, THOMAS M. BARRON AND JOHN C. GILLESPIE, T/A MADDEN, FERG, BARRON AND GILLESPIE, ATTORNEYS-AT-LAW, A PARTNERSHIP, PLAINTIFFS–APPELLANTS, AND HUDSON COUNTY BAR ASSOCIATION, INTERVENOR, v. TOWNSHIP OF DELRAN, A MUNICIPAL CORP.; TOWNSHIP OF BASS RIVER; TOWNSHIP OF WASHINGTON; CITY OF BEVERLY; CITY OF BORDENTOWN; TOWNSHIP OF CINNAMINSON; TOWNSHIP OF DELANCO; BOROUGH OF FIELDSBORO; TOWNSHIP OF HAINESPORT; TOWNSHIP OF MAPLE SHADE; BOROUGH OF MEDFORD LAKES; TOWNSHIP OF NEW HANOVER; BOROUGH OF WRIGHTSTOWN; BOROUGH OF PEMBERTON;

TOWNSHIP OF RIVERSIDE; TOWNSHIP OF SHAMONG; TOWNSHIP OF SPRINGFIELD; AND TOWNSHIP OF TABERNACLE, DEFENDANTS, AND STATE OF NEW JERSEY, OFFICE OF THE PUBLIC DEFENDER; ALFRED A. SLOCUM, PUBLIC DEFENDER; AND BURLINGTON COUNTY BOARD OF CHOSEN FREEHOLDERS, DEFENDANTS–RESPONDENTS.

Argued October 22, 1990—Decided February 10, 1992.

*Thomas M. Barron* argued the cause for appellants (*Ferg, Barron & Gillespie,* attorneys; *Thomas M. Barron, John C. Gillespie,* and *Ross G. Alber,* on the briefs).

*Carole A. Quattlander,* Assistant County Solicitor, argued the cause for respondent Burlington County Board of Chosen Freeholders (*Michael J. Hogan,* Burlington County Solicitor, attorney).

*Michael R. Clancy,* Assistant Attorney General, argued the cause for respondent State of New Jersey (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

*James Youngelson* argued the cause for *amicus curiae,* New Jersey State Bar Association (*Youngelson & Murray,* attorneys).

*Robert E. Margulies* submitted a brief on behalf of intervenor (*Margulies, Wind, Herrington & Katz,* attorneys).

The opinion of the Court was delivered by

WILENTZ, C.J.

The question before us is whether this Court should order government to pay attorneys who are assigned by the municipal court to represent defendants too poor to pay for counsel. Assuming our power to do so, we nevertheless conclude that the answer is no, at least not now. We reach that conclusion in view of the substantial number of municipalities presently making such payments or providing public defenders without being so ordered; in view of the probable increase in the number of municipalities that will do so in the future; and in view of the substantial preferability of the continued cooperation between the judiciary and the municipalities as compared to the inevitable confrontation that would result between the branches of government if such orders were to issue. In the meantime, the bar, which has shouldered the sometimes heavy burden of what is clearly an obligation of the public, an obligation imposed on the state constitutionally, *see Argersinger v. Hamlin,* 407 *U.S.* 25, 92 *S.Ct.* 2006, 32 *L.Ed.*2d 530 (1972), and "as a matter of simple justice," *Rodriguez v. Rosenblatt,* 58 *N.J.* 281, 295, 277 *A.*2d 216 (1971), will have to continue to

bear it, as it has borne so many others for so many years. We shall continue to encourage the other branches of government to lessen that burden and perhaps eliminate it. And in any event, we shall, by this decision, assure that the burden is more equally distributed among members of the bar. We shall do both not for the purpose of diminishing the traditional role of the bar in serving the public *pro bono,* for the bar seeks no such relief—indeed, its service to the public without pay today is probably greater than at any time. We shall do both only because this form of *pro bono* service—representing indigent defendants in municipal court matters—is inevitably not only inefficient but unfair to indigent defendants who suffer with unequal justice.

Up-to-date figures supplied by the Administrative Office of the Courts (AOC) show that today there are 307 municipal courts with public defenders. The survey of municipal courts taken in 1986, mentioned later and relied on at trial, showed 110 municipal courts with public defenders. The rough extrapolation used by the parties (the survey, of all municipal courts, produced a two-thirds response rate), suggested a total, statewide, of 165 municipal courts with public defenders at that time, compared to 307 now. While the situations are not identical, we note that more than 500 municipalities, without court order, have appointed municipal prosecutors.

Our decision today is based on our belief that more municipalities will join those who have appointed public defenders to represent indigent defendants (or who pay designated counsel to do so), thereby not only relieving the bar of this burden but increasing the likelihood of effective, fair, and equal representation of the poor, as well as more efficient operation of the municipal court. If that belief proves incorrect, we assume the Legislature will address this problem. *Cf. State v. Rush,* 46 *N.J.* 399, 413, 217 *A.*2d 441 (1966) ("[I]f legislation [is] necessary, it is idle to suppose it [will] not be enacted."). Put differently, although most unsatisfactory, the situation today does not call for statewide action by this Court. We cannot

forever accept a system so clearly inefficient, historically unfair, and potentially unconstitutional. We stay our hand only because we believe other branches of government, state, county, and local, are equally able to address the problem, equally committed to meeting the constitutional obligation, and equally concerned with the unfairness that inevitably affects the present system.

We may be forced, however, to consider appropriate action in some areas of the state. For instance, as noted later, Jersey City, which has had a public defender system since 1973, recently terminated it (effective July 1, 1991), forcing the municipal court to assign counsel to indigent defendants without compensation. The extent of potential unfairness to defendants and to the bar may be unacceptable, even considering our policy favoring voluntary cooperation. The basis for our decision today—the voluntary movement of municipalities towards public defender systems or paid counsel—is seriously threatened by this development.

I

The trial court's decision sustained the constitutionality of the system of attorney representation then in effect. It did so because of our decision in *Rush*, not because it agreed. Indeed, it explicitly found the system of assigning counsel not only unfair and inefficient but unconstitutional. It believed, however, that to so rule was beyond its power in view of the decision in *Rush* and the Appellate Division decisions that followed. The Appellate Division agreed. *Madden v. Delran*, No. A–5602–87 (App.Div. June 29, 1989). As the trial court said, "[t]he issue is now ripe for the Supreme Court's consideration." *Madden v. Delran*, No. L–099058–86 at 22 (Law Div. June 15, 1988).

II

The legal setting is familiar. The municipal court assigned plaintiff to represent an indigent defendant accused of driving

while intoxicated. On completion of the case he submitted his bill for counsel fees to the municipality, which declined to pay. We may assume that he knew the assignment was *pro bono,* that he would not be paid, and that under established law he had no legal right to be paid. *See In re Antini,* 53 *N.J.* 488, 495, 251 *A.2d* 291 (1969); *Rush, supra,* 46 *N.J.* at 412, 217 *A.2d* 441; *State v. Monaghan,* 184 *N.J.Super.* 340, 343, 446 *A.2d* 185 (App.Div.1982); *In re Spann Contempt,* 183 *N.J.Super.* 62, 65, 443 *A.2d* 239 (App.Div.1982); *Norton v. State,* 167 *N.J.Super.* 212, 216, 400 *A.2d* 801 (App.Div.1979). In the best traditions of the bar, he sought to change the established law. He brought suit for his fees. He did so not for personal gain—for when the municipality, after suit was started, tendered full payment of his bill, he refused it—but to remedy the clearly unsatisfactory system in his county of assigning counsel at the municipal court level.

The trial court treated his refusal to accept payment as having the effect of converting his suit for legal fees into one for a declaratory judgment that the present system was unconstitutional and that assigned counsel must be compensated. Various orders and amended pleadings to that effect were filed. We therefore face the underlying issue of whether counsel must be compensated when assigned by a municipal court to represent an indigent defendant constitutionally entitled to counsel because accused of an offense for which conviction entails a "consequence of magnitude." [1] *Rodriguez, supra,* 58 *N.J.* at 295, 277 *A.2d* 216.

If not for the record in this case, discussed later, the answer would be simple. Every constitutional claim that plaintiff asserts was disposed of in *Rush.* The taking of private property

---

[1] We note, and reject, various objections raised by the Public Defender concerning standing, justiciability, mootness, and the propriety of declaratory judgment relief. Whatever persuasiveness these objections may have, we nonetheless choose to reach the issues raised on their merits because of their obvious public importance.

for public use without just compensation, denial of due process, denial of equal protection, denial of the right to counsel, all were either explicitly or implicitly rejected in that case. See 46 *N.J.* at 405–09, 217 *A.*2d 441. As for the denial of counsel, we found that it could not be said "that assigned counsel are less qualified than counsel privately retained," *id.* at 406, 217 *A.*2d 441; in response to the contention that "our system of assignment casts an unequal burden as among members of the profession," we noted that our Rule (then *R.R.* 1:12–9(e)) "[was] designed to distribute the burden equally, subject only to such variations as may be dictated by the complexity of a case or other considerations relevant to the objective of full, competent representation," and that the Rule "seeks to assure such equality of treatment as the subject will permit," *id.* at 409, 217 *A.*2d 441; and further, that there was no showing that the plan envisioned by the Rule "has been enforced unequally, let alone invidiously." *Ibid.* Concerning all other constitutional claims, we observed that "the duty to defend the poor is a professional obligation rationally incidental to the right accorded a small segment of the citizenry to practice law." *Id.* at 408, 217 *A.*2d 441. The only qualifications to these holdings were that "conceivably the burden upon the bar could reach such proportions as to give the due process argument a force it does not now have," *ibid.*, and implicitly, the further possibility that the equality of burden as among members of the profession then found might change. *Id.* at 409, 217 *A.*2d 441.

Despite the rejection of those constitutional claims, we decided in *Rush* as a matter of policy to exercise our power to relieve the bar of its *pro bono* obligation to defend indigents accused of crime. *Id.* at 412, 217 *A.*2d 441. We did so because the obligation had become oppressive, even if not unconstitutional, and was likely to become even more so. The decision was read as requiring the counties thereafter to bear the costs. *Antini, supra,* 53 *N.J.* at 491, 251 *A.*2d 291. In *Antini,* although we declared that our power in accordance with *Rush* to compel payment of assigned counsel for juveniles would apply, we

declined to exercise that power because the Legislature, prior to our decision, had required the Public Defender to handle matters in the juvenile courts where counsel was constitutionally required. *Antini, supra,* 53 *N.J.* at 494, 251 *A.*2d 291.

■ Except for the equal protection question, we find no substantial difference between the record here and that in *Rush* that calls for fuller treatment of the issues. Witnesses who indicated their belief that experienced counsel in municipal court provide services superior to assigned counsel fell short of making out a case of constitutional deprivation. Although we do not now subscribe to what we said some years ago in *Rush*—to the effect that there is *no* difference in the quality of representation, see 46 *N.J.* at 406, 217 *A.*2d 441—the extent of deprivation demonstrated in this case was limited and confined largely to debatable opinions, albeit from experienced practitioners. Certainly there was no showing that the present system came even close to threatening a substantial deprivation of the right to the assistance of competent counsel. Even accepting that in general, a system of paid counsel, either paid by the court on assignment or supplied through a public defender, results in better representation than that provided by *pro bono* counsel, such a showing does not equate with a constitutional denial of counsel. As has often been noted, the right to counsel is the right only to the effective assistance of counsel, not to the best counsel. *E.g., United States v. Rubin,* 433 *F.*2d 442, 444–45 (5th Cir.1970) (and cases cited therein), *cert. denied,* 401 *U.S.* 945, 91 *S.Ct.* 961, 28 *L.Ed.*2d 228 (1971). To that we might add that the right to counsel does not guarantee that all defendants will have exactly the same level of quality in their representation. It is not only those who cannot afford counsel who may complain that others have better counsel, for if money is deemed to be an indicator of quality in this field, inequality touches all legal representation. Somewhat ironically, the plaintiff's claim here is, at least on this record, inconsistent with a companion claim of unfairness based on the fact that some courts almost invariably assign only those attorneys who

regularly appear—and are therefore the most experienced—in municipal court.

We do not mean to suggest that the differences complained of do not exist or that they are not undesirable. It is obvious that some municipal court cases need experienced counsel, that these cases are important, and that their numbers are growing. Our ultimate goal is to meet that need with the cooperation of other branches of government. We would much prefer a system better designed with equality of representation as one of its main goals. All we mean is that on the record before us there is no constitutional deprivation.

■ The claim of a taking of property, either without due process or without just compensation, *U.S. Const.* amend. V; *N.J. Const.* art. I, ¶ 1, although stronger than that presented in *Rush*, similarly falls short of showing a constitutional deprivation. The record simply fails to demonstrate what we posited in *Rush* as necessary for such an attack to succeed, namely, that "the burden on the bar [has] reach[ed] such proportions as to give the due process argument a force" it did not then have.[2]

---

[2]We recognize that courts in other states, examining the takings claim, have concluded that lawyers must receive compensation for mandatory indigent representation. *E.g., Pruett v. State,* 574 *So.*2d 1342, 1355–56 (Miss.1990) (Robertson, J., concurring), and cases cited therein. Such a holding is by no means uniform, and many states have concluded that uncompensated mandatory indigent representation does not violate the Takings Clause of either their state constitution or the Constitution of the United States. *E.g., Williamson v. Vardeman,* 674 *F.*2d 1211 (8th Cir.1982); *Huskey v. State,* 743 *S.W.*2d 609 (Tenn.1988).

Among those courts that have concluded that such a system is unconstitutional, several have found, under their respective state constitutions, a taking only where an attorney was required to expend funds out-of-pocket without full reimbursement; no taking occurred where, as here, an attorney was required to furnish services without compensation. *Stephan v. Smith,* 242 *Kan.* 336, 747 *P.*2d 816, 842 (1987); *State ex rel. Partain v. Oakley,* 159 *W.Va.* 805, 227 *S.E.*2d 314 (1976). Still other courts, again under their own constitutions, have found a taking only after concluding that the historical arguments in favor of compulsory representation are not as compelling as once thought. *DeLisio v. Alaska Superior Court,* 740 *P.*2d 437, 441 (Alaska 1987); *Pruett,*

*Rush, supra,* 46 *N.J.* at 408, 217 *A.*2d 441. All we have is a record that shows that a few lawyers—it is not at all clear how many—may have shouldered a heavy burden as a result of multiple assignments. Whether any such lawyer might have either a due process or a takings claim in his or her own right is not before us, for as we understand plaintiff's position, he seeks invalidation of the *entire* system on these grounds, not individual relief based on the uniqueness of his or anyone else's circumstances. We must remember that what we found constitutionally *permissible* in *Rush* against similar claims was a system that required *pro bono* assigned counsel in *all* indictable cases throughout the state when the defendant was indigent, the bar bearing the entire burden, as compared to a municipal system here that affects only a portion of its cases (because in many municipalities the bar has no burden, public defenders or assigned paid counsel handling all cases); that the cases involved in *Rush* concerned indictable crimes, in general requiring substantially more time on the part of counsel than most nonindictable offenses tried in municipal court. Although the record before us is incomplete, we note that in comparison to the 2,600 municipal court assignments in 1986 without compensation, *Rush* ruled there was no taking at a time (1966) when the total annual dispositions in the criminal division was about 13,000, see Annual Report of the Administrative Director

---

*supra,* 574 *So.*2d at 1357; *Jewell v. Maynard,* 181 *W.Va.* 571, 383 *S.E.*2d 536, 543 (1989). However, New Jersey's historical experience is much different from that of the other states. Compulsory representation of indigents in this state dates back at least until March 6, 1795, when our Legislature adopted what was apparently the first compulsory representation statute in the nation. Arnold S. Trebach, *The Indigent Defendant,* 11 *Rutgers L.Rev.* 625, 629 (1956). This statute provided that "[t]he court before whom any person shall be tried upon indictment, is hereby authorized and required to assign to such person, if not of ability to procure counsel, such counsel, not exceeding two, as he or she shall desire." William S. Pennington, *The Laws of the State of New Jersey, 1703-1820,* 162 at 184 (1821). Because of that difference, and because of our takings holding in *Rush,* we decline to follow the approach of those jurisdictions that have found such a system unconstitutional.

of the Courts (1965–1966), and *all* indigent defendants required assignment of counsel without compensation.

The 2,600 assignments in 1986 could have been distributed among the approximately 18,000 active members of the bar then in private practice. Administrative Office of the Courts & Office of Attorney Ethics, *Characteristics of the Bar of the State of New Jersey 1986*, at 24 (1987). Because the number of assigned cases (2,600) in 1986 is based on a survey of all municipal courts, a survey that had a two-thirds response rate, the parties have extrapolated the figure of 4,000 for the entire state (its accuracy questionable since insufficient information exists to warrant a straight line extrapolation). Assuming 4,000 cases a year, however, and assuming an equal-distribution system, a practitioner within the 18,000 person private bar could expect to be assigned only one municipal court case every four-and-a-half years.

■ The foregoing assumes that the constitutional claims can be maintained in this setting. Our response in *Rush* concerning the extent of the burden supports that assumption, although our prior observation in that same case suggests the contrary. See *Rush, supra,* 46 *N.J.* at 408, 217 *A.*2d 441 ("if one accepts the premise that the duty to defend the poor is a professional obligation rationally incidental to the right accorded a small segment of the citizenry to practice law, these claims fall away"). We note some cases that question whether a lawyer's services are "property" within the constitutional protections involved; we believe that they are. See *supra* at 600 n. 2, 601 *A.*2d at 215 n. 2. We note further the conclusion of other cases (directly contradicting our observation in *Rush* ) that there is no enforceable obligation on the part of the bar that can support a system of assignment without pay as against a constitutional takings claim. That conclusion, although perhaps appropriate in some jurisdictions, has no place in New Jersey, a state in which the ethical, enforceable obligation of attorneys to accept

such assignments has an unbroken history from colonial times. See *supra* at 600 n. 2, 601 *A.*2d at 215 n. 2.

We reach the main issue in the case, the equal protection claim. In *Rush* we dismissed that claim on the assumption that the then-existing Rule assigned cases to counsel in as equitable a manner as the practicalities of the problem allowed. There was at that time a Rule in effect that required assignment in each vicinage from a master list, the assignment to be made "in alphabetical rotation." See *Rush, supra,* 46 *N.J.* at 407, 217 *A.*2d 441 (quoting *R.R.* 1:12-9(e)). The current Rule requires that "such assignment shall, so far as practicable, be made either on rotation from the list of available counsel established and maintained at the direction of the Assignment Judge or under such other system as shall have been established by the Assignment Judge with the approval of the Supreme Court." *R.* 3:27-2. The record before us suggests that in Burlington County there was no such system in effect, but it does not establish very much more than that. What we have is direct evidence of the system of assignment of counsel in a number of municipalities in Burlington County, a fairly strong inference that all of the municipalities in that county without public defenders used that system (counsel assigned, to serve without compensation, based on the frequency of their paid appearances in municipal court), plus direct testimony that the same system was used in Ocean County. Almost all of the witnesses' specific testimony was directed solely to Burlington County, their references to a limited number of other counties giving little clue to the system, if any, used there. As for the balance of the evidence—a survey prepared by the AOC to aid the work of a Supreme Court committee (see *infra* at 605, 601 *A.*2d at 216)—it showed that twelve counties use a county-wide list in making such assignments, seven may conform to the Burlington model, and two are difficult to characterize.

The point is that the evidence, although clearly indicating a system unfairly affecting a few attorneys (the number men-

tioned at trial was ten to fifteen) with a municipal practice in Burlington County, and perhaps Ocean County, and although suggesting the possibility of similar conditions in neighboring areas, raises more questions than it answers. We do not know from the record how counsel are selected for *pro bono* assignments in the municipal courts in most of the state, although the AOC survey indicates that a majority of the counties attempt to conform to the spirit of the Rule by assigning attorneys from a master list that includes all the attorneys of the vicinage or county.

More than that, there is no quantification of the unfairness. Outside of Burlington County, we have no idea from the evidence produced how heavy the impact is of "unfair" assignment systems in other counties. Nor do we know the number of attorneys involved in those counties where the system is fair. We are left with the possible conclusion that, for instance, of the 2,600 assignments of counsel *pro bono* in the municipal courts in 1986, the overwhelming majority were fairly assigned. That is to say, it is entirely possible that most were assigned in accordance with a system that attempted to select them at random simply because they were attorneys. We do not express the opinion that that is the fact, we state simply what is the state of the record. It is a record that is sufficient, given the objectives of the Supreme Court's Committee on Court Appointments of Fiduciaries, Counsel and Experts (the Committee), at whose request the AOC conducted the survey, to evaluate the efficiency, fairness, and desirability of the present arrangements but insufficient to pass on a claim of equal protection. *See Greenberg v. Kimmelman*, 99 *N.J.* 552, 564–69, 494 *A.*2d 294 (1985) (explaining standards of both federal and state equal protection analysis). It is a record that may be sufficient to warrant the conclusion that some attorneys in Burlington County were disproportionately burdened, but not that the entire state system is constitutionally deficient. We note that thirty-four of Burlington County's thirty-eight municipal courts now have public defenders.

The trial court, despite its obvious belief that the statewide system was deficient both on equal protection and takings grounds, concluded that it was bound by *Rush* and Appellate Division decisions to sustain the system and to reject plaintiff's claims. *Madden, supra,* No. L–099058–86 at 18, 21. It may have been persuaded by the fact that despite whatever unfairness may have been demonstrated through the witnesses, all that they had proved was limited to a small part of the state. The survey proof, however, the *only* proof of the system statewide, showed approximately 12,500 cases *fairly* assigned (either to a public defender or to paid counsel) and 2,600 cases assigned without pay. Only 450 of these 2,600 originated in Burlington and Ocean counties. They may have unfairly and disproportionately affected a small number of attorneys; we know nothing of the balance. That is hardly enough to warrant a finding that the statewide system deprives counsel of the equal protection of the law.

### III

This is a most unusual case. We deal not with a statute but with a Court Rule concerning the matter, a Rule apparently enforced in some areas of the state but not others. We deal with the imposition of an obligation on a class—attorneys—intended to be fair and equal but in fact not fair in some cases, not because of any distinction in the Rule but because of its implementation in fact. No one claims that the incidence of unfairness follows as a necessary consequence of the administration of the Rule. Rather, it is clear that any inequality is unintended, stemming from the independent application of the Rule in various municipalities and counties.

We hold that under those circumstances the fact that in a state with 45,000 lawyers some relatively small number may be shouldering a heavier burden than others, and may be doing so without persuasive reason, is not sufficient to render the entire system invalid. Some of these very few may be entitled to an

exemption from further service, but the fact that the system does not work with mathematical precision to treat fairly *all* of those within the affected class surely cannot result in its invalidity. If, as is possible—the record does not tell us—the assignment of counsel without compensation in most counties is fairly distributed among all attorneys, and in those counties in which it is not, the disparity is minimal, and that in only two counties, containing a very small proportion of the attorneys in the state, is there any substantial unfairness, affecting but a handful of attorneys, then the system itself is not rendered invalid.

■ As a practical matter the issue becomes moot based on our resolution of the claims before us. Henceforth, counsel shall be assigned in each vicinage strictly in accordance with the mandate of the Rule: a list shall be prepared by the Assignment Judge for each vicinage that includes every attorney licensed to practice in this state whose primary office is in that vicinage. Assignment by any municipal court for *pro bono* representation of indigent defendants constitutionally entitled to such representation shall be strictly in accordance with that list, in alphabetical order. Indigency shall be determined by the court uniformly and in accordance with standards provided by the AOC.

The disadvantages of that system are obvious, but of one thing we are certain: there will be no disproportionate burden on any attorney in any vicinage except that which occurs by the luck of the draw—for some cases will undoubtedly require more work than others. No attorney who is authorized to practice law in that county, except for some in government service, shall be excused. If such assignment would otherwise be impermissible because of the attorney's relationship to the municipal court judge, the judge shall recuse himself or herself. The burden thus placed on the municipality to arrange for the substitution of another municipal court judge, and whatever

cost may be involved in that substitution, is simply an inevitable consequence of its decision not to compensate counsel.

Compliance with the foregoing implementation of the Rule shall commence no later than May 1, 1992. It shall be monitored in each vicinage by the trial court administrator, who shall supply its municipal court judges with the list and keep them informed of whose name is up next in the alphabetical rotation. Prior municipal court experience of the attorney, prior appearances by the attorney in the municipal court, all of the things that have resulted in the unfairness that have characterized assignments in Burlington County, shall have absolutely nothing to do with assignments in the future.[3] Any Assignment Judge who believes a fairer or more practical system can be instituted shall request permission of the Chief Justice for a variation on these requirements.

We touch on the problems underlying the foregoing system. With its fairness goes the possibility, indeed the certainty, that some attorneys will be assigned who have no experience either in municipal court or indeed in any court. Furthermore, financial pressures on unpaid counsel can affect their performance. We have lived with that system in many counties for some time. Real estate attorneys, corporate counsel, experts in commercial leases, all have been assigned to represent indigent defendants charged with simple assault, driving while intoxicated; all were required not only to learn how to defend those cases but to find out where the courthouse is. We have no doubt that on

---

[3]The record indicates concern, at least in Burlington, that appointment of attorneys from large firms as municipal court judges has had the effect of insulating substantial groups of attorneys from these assignments. We find that somewhat difficult to understand in view of the Rule's specific exemption from the disqualifications that would otherwise apply when the assignment is to serve an indigent defendant. *R.* 1:15–4. Presumably there is disqualification pursuant to *Rule* 1:12–1(f) or Canon 3 C(1) of the Code of Judicial Conduct, when the attorney is assigned to a case in the very municipality where his or her partner acts as municipal court judge. We do not intend even that disqualification to apply in that manner in the future. The judge, not the attorney, shall be disqualified.

occasion their inexperience has affected their representation, but the fact is that over these many years no substantial complaints of a failure of justice have been brought to our attention.

We do not mean to suggest that such failures have not occurred, but simply that they must not have been either frequent or substantial, otherwise we would have been informed. We leave it to the municipal court judges to direct counsel, who will usually inform them of their concerns, if any, about their competency, to provide substitute counsel when appropriate, a system explicitly recognized under the old Rules. Ultimately, however, if the municipal court judge concludes that defendant will not receive effective assistance of counsel, the judge's obligation will be to select other counsel. No such selection shall occur, however, until the court concludes that that counsel is unable to obtain a substitute. In almost all cases that will depend upon his or her financial ability to do so.

We realize that this revised system falls far short of the ideal. A system of public defenders or paid counsel is clearly far superior to what we order here. We do not order government to pay for counsel, putting aside the question of our power, only because we believe that the damage done to the judiciary and to the relationship among the branches of government would far exceed the damage done by this relatively inefficient system.

The system, thus revised, leaves us still with the distinct possibility of inequality between counties, attorneys in one county having to bear a heavier burden than those in others. This inequality has existed, apart from the appointment of counsel, for many years. It exists in many forms, and its root is the present system, which assigns to the county most of the costs of the judiciary. Some counties are better able to bear those costs than others, the result being an inherent inequality between counties in various aspects of the operation of our system of justice. Some of those inequalities affect counsel

even more than the assignment to represent indigent defendants in the municipal court.

The new system provided for in this opinion, will address most of the inequalities that now exist, especially those pointed out in this record that exist in Burlington County. There are other inequalities, however, not initially appearing in this record, brought to our attention after oral argument, that may call for a different approach. We have been informed, as noted above, that Jersey City has terminated its public defender system, and that indigent defendants there are now represented by assigned counsel without compensation. The impact of this termination has been enormous. The number of cases, the number of attorneys, the total impact, far exceeds what has occurred in Burlington County.

Although we decline to invalidate the entire system now in place, we reserve the right to change it—as we have changed it in this opinion—and to deal with it differently on a county or municipal basis if necessary. There are some municipalities that may have some at least arguable justification for not supplying public defenders or not paying assigned counsel. Those justifications are almost always financial, based on the relatively minor revenues flowing from the municipal court or the small number of indigent defendants entitled to appointed counsel. In Jersey City, however, the municipal court revenues in 1990 apparently exceeded expenditures by at least $5 million, making it one of the most profitable courts in the state. It accounted for almost 10% of all municipal court cases added statewide, and 19% of all such cases disposed of. Without minimizing the societal needs and financial difficulties of Jersey City and other urban areas, it is obvious that the elimination of the public defender there jeopardizes the entire system. Jersey City has had a public defender or its equivalent since 1973. Elimination of that office will severely damage the efficiency of its municipal court and impair the constitutional rights of its indigent defendants, all at the expense of a bar unable to protect itself because of this Court's Rules. For Jersey City,

the financial gain may be needed, but the cost to justice is so high that we may be forced to determine whether counsel should be relieved of the obligation to represent indigent defendants in that court or whether other steps must be taken.[4] We assume, however, that government will step in to provide the funds at that point, as we assumed in *Rush*.

## IV

We note other aspects of the equal protection problem. At the time of *Rush*, there undoubtedly were disparities in burden between counties, for the system in place at that time, deemed to satisfy equal protection requirements, assured equality only within the vicinage. Without doubt some vicinages had a higher number of assigned counsel cases per attorney than others. Yet despite the existence of that problem on a much broader scale and for more than 170 years, from at least 1795 to 1966, (see *Antini, supra*, 53 *N.J.* at 490, 251 *A.*2d 291), equal protection was found not to have been violated. The lesser burdens involved in municipal court assignments have but a short history—since 1971—compared to those involved in *Rush*.

We also note the imposition of burdens on attorneys that are not inflicted on other professionals, payment made to attorneys in the public service (*e.g.*, for public defenders) as compared to the *pro bono* assignments in private practice, both of which are clearly justifiable when tested by a rational basis standard. *See, e.g., Taxpayers Ass'n of Weymouth Township, Inc. v. Weymouth Township*, 80 *N.J.* 6, 364 *A.*2d 1016 (1976), *cert.*

---

[4]If similar situations jeopardizing statewide cooperation occur elsewhere, we shall consider similar action.

In a prior situation involving a failure of justice, not related to the representation of indigent defendants, the Assignment Judge of Hudson County ordered that all new actions instituted in the Municipal Court of North Bergen be conducted by a Superior Court Judge at the Special Civil Part of the Superior Court in Jersey City. (Administrative Order, January 22, 1987). We note also that two suits have recently been filed to compel Jersey City to reinstate its public defender system.

*denied,* 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.*2d 373 (1977). We note further that the equal protection problem today apparently exists within vicinages, attorneys practicing primarily in some municipalities not being assigned to the same extent as those in others. This problem will no longer exist in the future.

Given our underlying determination that no equal protection violation exists, we need not pursue the possible bases for justifying what might otherwise constitute invasion of constitutional rights—administrative convenience, fiscal constraints, the differences in expertise between those assigned and those not assigned, and the like. The same may be said for the possibility that those not assigned to serve *pro bono* in the municipal courts are doing substantial *pro bono* work in other areas. That the totality of *pro bono* work done by the bar far exceeds that done in representing indigent defendants in municipal courts we have no doubt. If, however, the disproportionate burden experienced by attorneys assigned in municipal court is fairly offset by the burdens voluntarily assumed in the many other areas of *pro bono* service, it is a happenstance, for the system has not yet been perfected to achieve that kind of equality. We note the constructive recommendations of the Committee, chaired by Judge Serpentelli, that would achieve such a balance, giving the judiciary the responsibility for measuring all *pro bono* service by attorneys and considering such service both in assigning further *pro bono* work, as well as in making fee-generating appointments. *Final Report of the Supreme Court Committee on Court Appointments of Fiduciaries, Counsel and Experts, reprinted at* 125 *N.J.L.J.* 52, 59 (March 29, 1990) [the *"Committee Report"*]. The AOC is in the process of designing a computerized record-keeping system for that purpose. Those recommendations, when implemented—the task is most complex—will make it possible to relieve counsel of municipal court assignments if off-setting *pro bono* work has been performed.

## V

A further question before us, not involved in *Rush*, is the effect on the Public Defender Act, *N.J.S.A.* 2A:158A–1 to – 25, of the amendment requiring representation in municipal court of indigent defendants constitutionally entitled to counsel. *N.J.S.A.* 2A:158A–5.2. All parties agree that the Legislature continually failed to fund its statutorily imposed obligation, and the trial court, following *Spann, supra,* 183 *N.J.Super.* at 65, 443 *A.*2d 239, and *Norton, supra,* 167 *N.J.Super.* at 216, 400 *A.*2d 801, concluded that the obligation was therefore unenforceable. As we noted in *Division of Youth and Family Services v. D.C.,* 118 *N.J.* 388, 399, 571 *A.*2d 1295 (1990), "even if a party is clearly entitled to compensation ... [f]inding no funds available for that purpose," the judiciary cannot compel the appropriation to satisfy the obligation. "Whether or not petitioners receive the money to which they are clearly entitled rests exclusively with the Legislature." *Id.* at 400, 571 *A.*2d 1295. We decline to use this occasion to delve into the possibility of using funds appropriated to the Public Advocate in a somewhat different way from that indicated by the Legislature and the possible conflict between the Appropriations Clause, *N.J. Const.* art. VIII, § 2, ¶ 2, and the constitutional obligation to provide counsel that might be involved. *See Robinson v. Cahill,* 67 *N.J.* 333, 354–55, 339 *A.*2d 193 (1975). As the Public Defender notes, assuming the size of the appropriation cannot be increased, any order redistributing the funds will either result in diminishing the services available to indicted indigent defendants or will exhaust all of the funds available for defense of indigents before the end of the fiscal year.

## VI

We decline to decide whether we have the power to require municipalities to pay counsel in assigned cases in the municipal court. We have implied in the past that we do. See *Antini, supra,* 53 *N.J.* at 495, 251 *A.*2d 291. That power may

derive from the same considerations mentioned in *Rush* (for the municipal court may fairly be regarded as an integral part of the system of criminal justice under the responsibility of the prosecutor); it may derive from the logic of *Antini* (implying that the juvenile-justice system is part of the criminal justice system, part of the prosecutor's responsibility funded by the counties); it may derive from the Public Defender Act; or, it may derive from this Court's responsibility to assure that its most fundamental obligation, the provision of constitutionally-required assistance of counsel to indigent defendants in criminal and quasi-criminal matters, is satisfied, and from its exclusive power over the administration of justice, including the administration of the municipal courts. *Cf. Division of Youth and Family Servs., supra,* 118 *N.J.* at 399–400, 571 *A.*2d 1295 (Court's power to order the "disbursement of public funds" limited to situations in which funds are "constitutionally mandated"); *In re 1987 Essex County Judicial Budget Impasse,* 109 *N.J.* 89, 533 *A.*2d 961 (1987) (courts may require counties to reasonably fund their courts); *see also Knox County Council v. State ex rel. McCormick,* 217 *Ind.* 493, 29 *N.E.*2d 405 (1940) (requiring counties to fund their courts is within the inherent power of court). At the very least, municipalities clearly have the authority (and have exercised it for many years) to pay for public defenders, *(see, e.g., N.J.S.A.* 2A:8–13, 40:6A–1), as we found counties did for assigned counsel in *Rush;* and, as there, sufficient authority may exist not only to withdraw counsel but, implicitly, to fix the payment obligation when the authority to pay exists. No violence to legislative intent would result, for, though unfunded, government's general obligation to meet this need has been explicitly recognized by statute.[5]

On the other hand, a judicial order directed at municipalities would lose the flexibility of the current system in which many

---

[5]We note further the recent legislation recognizing municipal power to pay assigned counsel in municipal court. *L.* 1991, *c.* 337 (expanding lien of municipality for its cost of assigned counsel).

municipalities provide a public defender or paid counsel on a voluntary basis. A statewide mandatory structure for all would undoubtedly have to consider issues of uniformity, *e.g.,* comparable pay for all public defenders throughout the state, appointment of public defenders perhaps on a regional basis if local conditions do not justify a single defender, options for payment of assigned counsel subject to detailed standards. In short, we would be developing standards in an area ordinarily reserved to the Legislature and the Executive and presumptively better left there.

We note that the remedy we have selected conforms generally to the recommendations of the Committee "for designation of attorneys from a central appointment list of attorneys practicing in the particular county, or those attorneys residing in the county if they have designated that county as their preference for appointing purposes.... Designated attorneys would be allowed the option of employing substitute attorneys; however, they would retain responsibility for the representation provided to indigent defendants." *Committee Report, supra,* at 61.

We realize that it is the bar that is bearing the burden of our restraint reflected in this decision. We trust that the bar understands the strong policy considerations that have persuaded us. As has so often been the case, it is the bar that makes the system work, often without compensation.

Our current system is unworthy of the traditions of this state. We note that legislation proposed by the Law Revision Commission would require every municipality to provide a public defender for the municipal courts. *New Jersey Law Revision Report & Recommendations Relating to Municipal Courts,* (November 1991) at 14 (proposed *N.J.S.A.* 2B:12–27). We have no doubt that that is the ideal system, not ideal in the sense of unrealistic but ideal in the sense of the best system to meet the constitutional requirement. It is the most efficient, the fairest, the most likely to achieve equal and effective representation of indigent defendants at the least cost. It is a

system that should be instituted by other branches of government. We urge them to act and trust they will. The victim in the present system is not the bar, but the poor.

The judgment of the Appellate Division is modified to conform to our decision. The system is constitutional but must be revised.

*For modification*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.